THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TREADEST MURRAY (Impleaded) *et al.*, Defendants-Appellants.

(Nos. 58138, 59174 cons.;

First District (2nd Division)—November 25, 1975.

522

James J. Doherty, Public Defender, of Chicago (Stanley Sacks, Assistant Public Defender, of counsel), for appellant Treadest Murray.

Edward M. Genson, of Chicago, for appellant Sam Dillon.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jerald A. Kessler, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Indictment No. 70-1247 charged defendants-appellants Treadest Murray (hereinafter defendant or, when distinction is required, Murray) and Sam (Samuel) E. Dillon (hereinafter defendant or, when distinction is required, Dillon) with the murder of one John Sterling (two alternative counts: Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(1),(a)(2)) and with the aggravated batteries of Tommie Akins, Robert Chatmon, and Barbara King (three counts: Ill. Rev. Stat. 1969, ch. 38, par. 12—4(b) (1)). Both defendants pled not guilty to each count. After a jury trial, in which defendants were represented by separate counsel and in which each interposed a separate alibi defense, both defendants were acquitted of each charge of aggravated battery, but were convicted of murder. Post-trial motions for a new trial and arrest of judgment were heard and denied. After a hearing in aggravation and mitigation, each defendant was sentenced to a term of from 14 to 20 years in the Illinois State Penitentiary. Each defendant then filed a separate appeal and each was represented on appeal by separate counsel. The appeals were consolidated for oral argument and opinion.

The basic facts from which the charges arose may be summarized as follows: At some time between 8:45 and 9:30 p.m. on the night of 17 April 1970, two black men entered the Wonder Club Bar at 317 West Division Street in Chicago. At that time there were about 50 to 60 customers in the bar, who were being served by three bartender-waiters and two floorwalkers. One or both of the men began firing guns. After several shots had been fired, the two men left the bar. John Sterling was shot twice and died shortly afterwards from one of his bullet wounds. Tommie Akins, Robert Chatmon, and Barbara King each sustained one bullet wound.

In the separate appeals, Murray presents two issues for review; Dillon presents four (actually five) issues, of which two are the same as the two presented by Murray. The two common issues, themselves interrelated, are:

(1) The State's evidence was legally insufficient to prove the guilt of each defendant beyond a reasonable doubt.

(2) The verdicts of guilty of murder but not guilty of each count of aggravated battery are logically inconsistent in that the only question before the jury was whether the respective defendant was identified as one of the two assailants; this logical inconsistency contributes to a reasonable doubt as to the guilt of each defendant.

One of the additional issues presented by Dillon is closely related to the two common issues. Dillon contends that the verdicts are not only logi-

cally inconsistent but are also legally inconsistent; since they are legally inconsistent, the conviction of murder must, as a matter of law, be either reversed outright or at the least reversed and remanded for a new trial on all counts. These three issues focus our attention on the identification evidence adduced by the State at the trial and on the evidence adduced by each defendant at the trial as to his identification and as to his alibi. A detailed summary of the trial evidence is therefore necessary.[1]

After the deceased's wife had testified as the State's "life and death" witness, the State called Lee Liddell, who identified himself as a bartender working in the Wonder Club on the night of the shooting. He testified that, at about 8:30 p.m. on the night of Friday, 17 April 1970, he saw both defendants enter the Club, walk around it for about 5 minutes, and then leave. He was then standing alongside a telephone booth just to the left of the front door (from the point of view of one entering the Club by that door).[2] There were then about 50 people in the Club. He heard Dillon say to some person other than Murray (which person was unknown to the witness): "There is the fellow who saw us the other night." At about 8:45 p.m., both defendants entered the Club by the front door; the witness was still standing in the same place. Dillon walked in the aisle between the tables and the bar to about the midpoint of the bar; Murray followed a few feet in back of Dillon. Each defendant then simply pulled out an automatic weapon and began firing it. Dillon was about 9 feet way from the witness, and Murray was about 4 feet away; Murray was opposite to and in front of the witness. One Jelena Tolbert, another employee of the Club working that night, was in the rear of the room. The witness heard five shots, after which defendants backed out the front door. Mr. Sterling was wounded; he had been sitting at the bar on about the second stool from the front end of the bar. The witness immediately called the police, who arrived in 5 to 10

---

[1] Each defendant filed a pretrial motion to suppress any in-court identification of him by either of two of the State's occurrence witnesses (namely, Lee Liddell and Jelena Tolbert, who were working in the Wonder Club on the night of the shooting as, respectively, bartender-manager and waiter). The ground for the motion was the alleged suggestiveness of a photographic identification which each occurrence witness had made of each defendant at a police station on the night of the shooting. The motions to suppress were denied, and neither defendant has raised any issue as to that denial in his appeal. It is therefore unnecessary to review the evidence presented at the hearing on the motions.

[2] Photographs introduced into evidence by the State as exhibits show that the Club consisted of one room which extended in a north-south direction with the front door at the north end of the room. From the point of view of one entering the Club through the front door, a line of tables and chairs stretched along the east wall. A bar extended along most of the west wall with about 20 bar stools arranged in front of it. The room was about 30 to 50 feet in length.

minutes. Within 20 minutes thereafter, the police took the witness and Tolbert to a police station where the witness examined about 100 police photographs and made a photographic identification of each defendant. The witness had occasionally seen Dillon in the Club prior to the night of the shooting. There was a handgun, which was owned by the witness' employer and for which the witness had a permit, kept in a locked drawer behind the bar; the witness did not fire that gun at any time on that night. The witness then identified certain State's exhibits as accurate photographs of the Wonder Club exterior and interior as it looked on the night of the shooting. The witness also identified State's exhibit No. 7 for identification as a police photograph of Sam Dillon which he had seen for the first time at the police station after the shooting, and which he had identified as depicting one of the two men involved. He similarly identified State's exhibit No. 8 for identification as a police photograph of Treadest Murray, which he had also identified at that time and place as depicting the other man involved. The witness then made in-court identifications of each defendant.

On cross-examination, Liddell testified that one Wilbert Norman, a bartender for the Club, was working behind the bar when the two men first came in; he did not know exactly where Tolbert was either at that time or when the two men entered the second time. There were about 50 people in the Club, about 30 at the tables and about 20 at the bar, and it was noisy. The first of the two men to enter the first time had on a tan jacket and a sport shirt; he had no necktie and no hat. The witness did not remember the color of his pants or shoes. The witness did not recall the color of his eyes or the shape of his nose or jaw or the length of his hair. The second man was short and dark-complected; the witness did not recall the color of his pants or shoes or the type of coat he was wearing. They stayed about 10 minutes, walked around the front half of the Club, and left by the front door. They reentered about 5 minutes later. Both then had automatic weapons in their hands. They stayed for about 10 minutes and shot up the place. It was at the police station that the witness had first described the two men to the police; he had not been asked to describe them before. He described them as Negroes, one wearing a light jacket and the other wearing a dark jacket. The photographs which he had examined at the police station had been in a small file box, and they had been divided by index cards from "A" through "Z"; he had examined the back half of the group from "N" through "Z"; but had not examined the front half. Tolbert was seated at the opposite side of the table, about 2 feet away. The witness examined a photograph and then handed it to Tolbert, who then in turn examined it. The wit-

ness had seen Dillon in the Club over six times, and had cashed paychecks for Dillon on three or four of those times; he knew Dillon by face but not by name. He had never gone out with Dillon's ex-girlfriend. He told the police that he had seen the two men before, but he did not tell the police that he knew the men.

The second occurrence witness for the State was Jelena Tolbert. He testified that, on the night of the shooting, he was working in the Wonder Club on the floor, waiting on tables. At about 9 or 9:30 p.m., Murray came into the Club. Murray was wearing a black jacket and a white tee shirt. Murray looked young to the witness, so the witness asked Murray if Murray had an I.D. card. When Murray said no, the witness told Murray that he would have to leave the Club, but that he could first use the washroom at the rear of the Club. Murray did so. The witness then saw Murray speak to Liddell for two or three minutes, but he did not know what was said. Murray then left the Club by the front door. He returned about 3 minutes later with Dillon. This was the first time that the witness had seen Dillon on that night; the witness recognized Dillon by a headband which he wore around his head. When Dillon came in the front door of the Club, he had a gun held down by his side. When the witness saw the gun in Dillon's hand, the witness, still in the rear of the room, backed behind the bar through the rear entranceway to the bar, which was near the washroom at the rear of the Club. As a result, the witness did not see who fired the several shots. When the firing began, the witness dropped to the floor behind the bar. Before hiding behind the bar, however, the witness had seen Dillon in the aisle at about the midpoint of the bar, backing toward the front door. At that time, Murray was standing in the aisle alongside the telephone booth and Liddell; the witness did not see Murray with a gun. While the witness did not see who fired the shots, the first shot came from where Dillon was backing away toward the front door. There were 50 to 60 people in the Club (about 20 at the bar) and it was crowded. After the police came, the witness did not speak to them, but 15 or 20 minutes later, the police took the witness and Liddell to the police station. They put photographs on a table in a room, and then they left the room. The witness examined about 100 police photographs; he picked out photographs of Dillon and of Murray as depicting the two men who had entered the Club at the time of the shooting. State's exhibits Nos. 7 and 8 are two of those photographs. The police had not asked him for a description of the men. Before that evening, he had not known Dillon by name and had never before seen Murray. Just after the shooting, the witness had taken a .38-caliber revolver from a drawer behind the bar, had put it in his pocket, and had gone outside; he had not seen anybody

outside, so he went back into the bar and replaced the gun in the drawer. He did not fire the gun that night nor had he ever fired it at any time.

On cross-examination, Tolbert testified that the man who entered the Club the first time and whom he had asked for an I.D. card, was wearing a short black jacket and a white tee shirt; he had black hair and popping big eyes (bug eyes), but the witness could not recall the color of his eyes or the color of his pants. The man was by himself that first time. When he came back into the Club the second time, the witness did not see him with a gun or firing any shots. The witness stated that Dillon was shooting at him that night because he had asked Dillon's girlfriend out; but he had not known Dillon before the shooting. The witness had been in the United States Army for 7 years; he had been convicted of robbery and had been court-martialed.

The State then called each of the three persons who had been struck by bullets that night.

Barbara King testified that, on the night of the shooting, she was in the Wonder Club with her older sister. At about 9:20 p.m., she was seated alongside her sister at about the center of the bar. While sitting there, she saw Murray (whom she had never seen before) talking to Tolbert, who was asking him for identification. Later, as she was talking to her sister, she heard noises like firecrackers. She looked toward the front of the bar and then got down to the floor. She was hit in the head by a bullet, but she did not know who fired the shots. She did not see Murray with a gun on that night, and she did not see Dillon in the Club at all on that night.

Tommie Akins testified that he arrived at the Wonder Club at about 8:35 p.m. on the night of the shooting. He was in the washroom in the rear of the Club when he heard noises which sounded like firecrackers. He put his head out the door of the washroom and was hit in the jaw by a bullet. He did not know who shot him and he could not identify either defendant as having been present in the Club that night.

Robert Chatmon testified that he was in the Wonder Club on the night of the shooting. A few seconds after he had entered the Club, when he was standing about 9 or 10 feet from the front of the Club and looking around him while heading toward the rear of the Club, he was shot in the left leg just above the knee. He did not know who shot him and he could not identify either defendant as having been present in the Club on that night.

Wilbert Norman, a bartender in the Wonder Club on the night of the shooting, testified that, at about 9:30 p.m., he was behind the bar toward the rear of the Club, walking toward the midpoint of the bar.

Suddenly, two glasses were blown out of his hand by bullets. He dropped to the floor. When the shooting started, Tolbert was in the rear of the Club about 9 feet away from the witness. The witness did not know who had done the shooting. He had never seen either defendant prior to the day he testified at the trial.

Chicago Police Officer Dennis Noga testified that, in response to a radio message to patrol cars, he and his partner arrived at the Wonder Club at about 9:45 p.m. on the night of the shooting. Liddell had described one of the two men as a male Negro, 6 feet tall, wearing a dark headband and a light colored jacket; Liddell had also described the other man. If Liddell had told the witness that he (Liddell) knew the names of the men, the witness would have included that fact in his police report; no such fact was in the report. The witness had inspected the premises for evidence. He found one .25-caliber cartridge casing and one .9-mm cartridge casing but no other physical evidence. One casing was lying on the floor toward the middle of the Club; the other was lying on the floor at the front of the Club between the front end of the bar and the front door. The casings were about 20 to 25 feet apart.

Detective Thomas Creighton testified for the State that, at about 10:10 p.m. on 17 April 1970, he had been assigned to investigate a shooting which had just occurred at the Wonder Club. He went to the hospital where Mr. Sterling was, and found that Sterling's injuries were grave and that he could not be interviewed. The witness then went to the police station, where he met Liddell and Tolbert. In a private office at the police station, he showed them about 100 police photographs; he said nothing to them while they were examining the photographs.

The final witness for the State was Dr. Jerry Kearns, a pathologist for the Coroner of Cook County. On 18 April 1970, he had examined the body of the deceased, John Sterling. Mr. Sterling had died as a result of a bullet wound; the bullet had entered the left side of his abdomen, had exited on the right side of his back, and had lacerated the aorta and the vena cava.

Five witnesses testified in behalf of Murray; three were occurrence witnesses (whose testimony was equally in behalf of Dillon) and two were alibi witnesses.

Cosette Armstrong testified that she was in the Wonder Club with friends at about 9 p.m., the approximate time of the shooting. Earlier that night there had been some sort of argument in the Club and a couple of fellows had been ejected from the Club. The witness had seen the two men who were ejected, and neither defendant was one of those two men. Later, one of the witness' friends said: "There's those fellows and they have guns." The witness turned around and saw the fellows;

she did not know them but they were the same two men who had been ejected, and she was positive that neither defendant was one of those two men. The witness had not known either defendant prior to 17 April 1970 and did not even know them at the time she was testifying. The witness did not see any shooting because she turned away from the two men so that they would not see her looking at them. When she turned away, she heard shooting and saw a flash from the rear of the Club. The witness thought that she could recognize, describe, and identify both of the men who had done the shooting, but she would not describe them for fear of reprisal; however, they looked nothing like the two defendants.

Johnny Nelson testified that he was in the Wonder Club at the time of the shooting. About 8 p.m. on that night, two men had come into the Club and had thereafter been ushered out by a short, heavy bartender who "manhandled" one of them. The witness did not know either of the men who had been ushered out and did not even know what they looked like because he had simply casually noticed them, but neither defendant was one of those two men. The witness had never seen either defendant before testifying at the trial. A short time later, two men had come into the Club with guns, and shooting followed at the rear of the Club. The witness could not say whether the two men who did the shooting were the same men as the two that had been ushered out earlier. At the time of the shooting, the witness was seated at the back end of the bar near the washroom. During the shooting, the witness saw a heavy-set bartender come out from behind the bar at the rear of the Club, face toward the front of the Club, and fire a shot. When he fired the shot, the bartender was about 4 or 5 feet away from the witness. The witness could not describe either of the two men who had been ejected or either of the two men that had done the shooting, but neither defendant was one of any of those men. On cross-examination, the witness stated that he could not say whether he saw the men who did the shooting.

Oliver Emerson identified himself as the brother-in-law of the deceased John Sterling. He testified that, on the night of the shooting, he had been in the Wonder Club with John Sterling. They had entered the Club about 8:45 p.m. or sometime between 8:45 and 9:15 p.m. They were sitting at the front end of the bar. The witness heard some sort of an argument between Tolbert and two men in the rear of the Club; the argument was about someone not being of drinking age. Tolbert was asking the two men to leave the Club and the men were leaving and did leave. The witness did not see the face of either of the two men. The witness then heard Tolbert ask for "that piece" and saw a man behind

the bar hand a pistol to Tolbert. After a while, somebody entered and started shooting. The witness did not know whether the shooters were the same two men who had been earlier asked to leave. When the witness heard the shots, he dropped to the floor and then crawled to the ladies' washroom at the rear of the Club. John Sterling ducked, and the witness did not see him again until after the shooting had stopped. After the shooting stopped, he saw Tolbert put a gun into a drawer. The witness did not see either of the men who were asked to leave the Club so as to be able to give any description of them whatever, did not see who had done the shooting, did not see anyone with a gun except Tolbert, and did not know whether Tolbert ever fired the gun he had. The witness could not say that either defendant was shooting in the Wonder Club on that night.

Christine Kent testified that, at 6:30 p.m. on the night of 17 April 1970, she went to the home of her friend, Irene Gurley. Her friend, Treadest Murray, was then at the Gurley home, and the witness knew that he would be there because he was living there at the time. She had met Murray through Irene Gurley's oldest son, who was about the same age as Murray. At about 8 p.m., the three left the Gurley home and went to a tavern called The Blue World, located at 18th Street and Karlov Avenue, which was about one block away from the Gurley home. The three remained at The Blue World until 11:30 p.m., drinking, dancing, and listening to music. The three then returned to the Gurley home. When the witness left the Gurley home at about 12:30 a.m. on 18 April 1970, Murray was still there with Irene Gurley. The three of them had been both at Irene's home and at The Blue World on prior occasions. There were a lot of people in The Blue World on the night of 17 April 1970, but the witness knew none of them by name. Murray had danced a couple of times with some women who were there, but the witness did not know the women. The witness could not name anyone who had seen Murray at The Blue World on that night.

Irene Gurley substantially corroborated the alibi testimony of Christine Kent in behalf of Murray, except that her testimony was inconsistent as to when Murray had first arrived at her home on the night of 17 April 1970. She first said about 7 or 8 p.m.; then about 7:30 or 8 p.m.; and finally about 9 p.m. She stated that Murray had always treated her just like a mother ever since she had first met him through her own son.

Three alibi witnesses testified in behalf of Dillon.

Shelma Dillon identified herself as the sister of Dillon. She testified that, on 16 April 1970, she and Dillon had gone by Greyhound bus to Cincinnati, Ohio, for the purpose of visiting a Mr. Eugene Fields (a

friend of Dillon and of the Dillon family) and Mrs. Fields on the occasion of Mrs. Fields' birthday, which was April 17. There was a birthday party at the Fields' home on 17 April 1970, and she and Dillon were at the party from 7 p.m. to midnight. She and Dillon stayed in Cincinnati until 19 April 1970, on which date they returned together to Chicago.

Mr. Eugene Fields testified that, on 16 April 1970, he and his wife and two friends met Dillon and Dillon's sister Shelma at the Greyhound bus terminal in Cincinnati. They all then had something to eat, and then went to the Fields' home where Dillon and his sister stayed during their visit. The witness testified to details of how he spent time with Dillon in Cincinnati on 17, 18, and 19 April 1970. The witness had met Dillon in 1965, had seen him three or four times in Chicago in the intervening 5 years, had liked him, and had simply telephoned to invite him and his sister to the birthday party.

Mrs. Jeanette Fields corroborated the testimony of her husband, Eugene, as to the presence of Dillon and his sister Shelma in Cincinnati, from 16 to 19 April 1970.

Finally, Dillon testified in his own behalf as to being in Cincinnati on 17 April 1970. His testimony corroborated the testimony of his sister Shelma and of Mr. and Mrs. Fields. He then denied any involvement in the shooting in the Wonder Club.

OPINION

We deal first with the contention of each defendant that the verdicts of guilty of the murder of John Sterling but not guilty of the aggravated batteries of Tommie Akins, Robert Chatmon, and Barbara King are logically inconsistent, and with the related contention of Dillon that the said verdicts are also legally inconsistent.

■■ Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist. A classic example is *People v. Pearson* (1973), 16 Ill.App.3d 543, 306 N.E. 2d 539. In that case, the defendant was accused of having fired shots at two police officers. He was charged with two counts of aggravated assault and two counts of armed violence. In a bench trial, the defendant was found guilty of the two counts of aggravated assault but not guilty of the two counts of armed violence. This court, analyzing the essential elements of the offense of aggravated assault and of the offense of armed violence, concluded that, under the circumstances of the case, each offense had the same essential elements. Hence, the findings were neces-

sarily contradictory as to the same essential elements, and, as such, were legally inconsistent. This court, therefore, reversed the convictions for aggravated assault.[3]

While we have not found any case which expressly so states, we think that, in cases involving legally inconsistent verdicts or findings, the reason why the conviction must be reversed (whether with or without a remand for a new trial on all counts) appears to be that, in such cases, the conviction as a matter of law cannot be deemed to have been based upon proof beyond a reasonable doubt.

■■ Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, while not legally inconsistent because the two crimes have different essential elements (*People v. Hairston* (1970), 46 Ill.2d 348, 263 N.E.2d 840), may nevertheless be logically inconsistent. Verdicts are logically inconsistent when they can be construed to involve both the acceptance and the rejection of the same theory of the case for the State or the same theory of the defense. If they cannot be construed in any other way, then their logical inconsistency is a factor which contributes to the existence of a reasonable doubt as to the conviction, and that factor must be considered by a reviewing court in reviewing the defendant's contention on appeal that the evidence did not prove the defendant guilty beyond a reasonable doubt. Unless also legally inconsistent, however, logically inconsistent verdicts or findings do not *per se* require reversal (with or without a remand for a new trial on all counts) because, despite the logical inconsistency, the reviewing court may nevertheless find that there was adequate evidence for the State which, if believed, proved the defendant guilty beyond a reasonable doubt.

In the instant case, defendants were convicted of the murder of John Sterling under alternative counts of murder. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(1), (a)(2).) Those statutory provisions are as follows:

> "9—1. (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death;
>> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

---

[3] The outright reversal, without remand for a new trial on all counts, was based on Federal and State constitutional grounds. This court thought that the Supreme Court's determination in *People v. Hairston* (1970), 46 Ill.2d 348, 263 N.E.2d 840, that the appropriate remedy for legally inconsistent verdicts was reversal and remand for a trial on all counts was dictum.

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *."

Hence, at the very least, the jury must have believed from the evidence adduced by the State and despite the evidence adduced by the defendants that (1) the defendants without lawful justification performed the acts which caused the death of John Sterling, (2) knowing that such acts created a strong probability of death or great bodily harm either to John Sterling or to another.

Simultaneously, however, the jury acquitted the defendants of the aggravated batteries of Tommie Akins, Robert Chatmon, and Barbara King, the three patrons of the Wonder Club who had received bullet wounds in the same shooting as that in which John Sterling had been killed. Aggravated battery is defined by combining sections 12—4(b) and 12—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1969, ch. 38, pars. 12—4(b), 12—3(a)). Those statutory provisions are as follows:

"§ 12—4. Aggravated Battery.

* * * (b) A person who, in committing a battery either: (1) Uses a deadly weapon; * * *.

§ 12—3. Battery.

(a) A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual * * *."

Hence, the jury, from the evidence adduced by the State and from the evidence adduced by the defendants did not believe that the defendants without lawful justification had intentionally or knowingly caused bodily harm to any of the three named individuals, while using a deadly weapon.

On appeal, each defendant characterized those verdicts as logically inconsistent by alleging that the only question of fact before the jury was the identification of defendants as the shooters in the Wonder Club, despite the testimony of Cosette Armstrong that defendants were not the shooters and despite the alibi evidence for each defendant. On this assumption, defendants contend that, on the murder charge as to John Sterling, the jury accepted the identifications of defendants as the shooters and rejected both the testimony of Cosette Armstrong that they were not the shooters and the alibi testimony for each defendant; whereas, on the aggravated battery counts as to Tommie Akins, Robert Chatmon, and Barbara King, the jury rejected the identifications of defendants as the shooters and either accepted the testimony of Cosette Armstrong that they were not the shooters or accepted the alibi testimony for each defendant or both.

While appellate counsel for Murray conceded that these verdicts were

not legally inconsistent, appellate counsel for Dillon in his brief suggests, almost in passing, that the verdicts were not only logically inconsistent (his principal contention) but also legally inconsistent. A mechanical application of the test for legal consistency adopted by our Supreme Court in *People v. Hairston* (1970), 46 Ill.2d 348, 362 (namely, " 'In law there is no inconsistency in verdicts of acquittal and conviction upon charges of crimes composed of different elements, but arising out of the same state of facts' ") would lead to the conclusion that the verdicts in the instant case were not legally inconsistent since the crime of murder of John Sterling and the crimes of aggravated battery of Tommie Akins, Robert Chatmon, and Barbara King are obviously crimes composed of different essential elements. But the instant case appears to be unique in that, in every other case which has been cited to us or which we have been able to find, the acquittal has been of the greater crime and the conviction has been of the lesser crime; here, however, the acquittal was of the lesser crimes and the conviction was of the greater crime. The conviction for the murder of John Sterling, requiring findings as to all the essential elements of murder, would seem necessarily to require, as a matter of legal consistency, the same findings as to the essential elements of aggravated battery of the three other patrons, which, so far as they go, are either the same as, or less exacting than, the essential elements of murder. Hence, despite the different essential elements of the two crimes, the verdicts would be legally inconsistent.

But a recent decision of our Supreme Court (*People v. Dawson* (1975), 60 Ill.2d 278, 326 N.E.2d 755) appears to us to have taken a new approach to the matter of legally as well as logically inconsistent verdicts or findings. In that case, a gasoline service station attendant was robbed and shot to death by one David Hawkins. Although Dawson had not been in the station when Hawkins shot and robbed the attendant, Dawson was alleged to have been the accomplice of Hawkins in the armed robbery in that Dawson had suggested the armed robbery, had been the owner and driver of the automobile used in the robbery, and had supplied Hawkins with the .22-caliber pistol with which Hawkins had killed the attendant. Dawson was charged in a three-count indictment as follows: In Count I with the murder of the attendant under the accountability statute; in Count II with the murder of the attendant under the accountability statute while committing the forcible felony of armed robbery; in Count III with the armed robbery of the attendant. Hawkins pleaded guilty to a charge of murder and was sentenced to the Illinois State Penitentiary for a term of not less than 35 nor more than 95 years. Dawson pleaded not guilty to each count of his indictment. After a jury trial, the jury found Dawson not guilty of murder, but guilty of armed robbery.

On appeal, this court (with one Justice dissenting) found those verdicts both legally and logically inconsistent and reversed Dawson's conviction for armed robbery. (*People v. Dawson* (1974), 19 Ill.App.3d 150, 310 N.E.2d 800.) The majority held that, since the jury had found that Dawson committed the offense of armed robbery of the attendant as the active accomplice of Hawkins, and since it was undisputed that in the course of that armed robbery, Hawkins had shot and killed the victim of the armed robbery, it necessarily followed that Dawson was guilty of felony-murder under the accountability statute. Hence, the verdict of not guilty of felony-murder was both legally and logically inconsistent with the verdict of guilty of the same armed robbery, and the inconsistency required the reversal of the conviction of armed robbery. In effect, under the circumstances, when the jury acquitted Dawson of felony-murder under the accountability statute, it necessarily acquitted him of the armed robbery which was the forcible felony involved. "A verdict which acquits the accused of a crime which includes acts necessary for the commission of another crime for which he is found guilty is inconsistent." *People v. Dawson* (1974), 19 Ill.App.3d 150, 155.

Our Supreme Court granted the State leave to appeal. In reversing this court, our Supreme Court said (*People v. Dawson* (1975), 60 Ill.2d 278, 280-281, 326 N.E.2d 755, 756-757):

> "The appellate court majority treated the case as though it involved only a verdict of not guilty of felony murder under the accountability statute, and a verdict of guilty of armed robbery. Considering the case upon this assumption, we do not agree with the reasoning of the majority. Rather we think that the appropriate considerations are those discussed by Judge Friendly in *United States v. Carbone* (2d Cir. 1967), 378 F.2d 420:
>
> > 'The very fact that the jury *may* have acquitted of one or more counts in a multicount indictment because of a belief that the counts on which it was [*sic*] convicted will provide sufficient punishment, see Steckler v. United States, *supra*, 7 F.2d at 60, *forbids allowing the acquittal to upset or even to affect the simultaneous conviction.* We have repeatedly so held, e.g., in United States v. Coplon, 185 F.2d 629, 633, 28 A.L.R.2d 1041 (2 Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), United States v. Marcone, 275 F.2d 205 (2 Cir.), cert. denied 362 U.S. 963, 80 S.Ct. 879, 4 L.Ed.2d 877 (1960), and United States v. King, 373 F.2d 813, 815 (2 Cir. 1967). Indeed, if the rule were otherwise, the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others—almost

536

the opposite of the standard instruction, which is obviously beneficial to criminal defendants, and which the judge gave here without objection. It is true, as both Judge Hand and Mr. Justice Holmes recognized, 7 F.2d at 60, 284 U.S. at 394, 52 S.Ct. 189, that allowing inconsistent verdicts in criminal trials runs the risk that an occasional conviction may have been the result of compromise. But the advantage of leaving the jury free to exercise its historic power of lenity has been correctly thought to outweigh that danger. See United States v. Maybury, *supra*, 274 F.2d at 902-903.' * * * see also *Dunn v. United States* (1932), 284 U.S. 390, 76 L.Ed. 356, 52 S.Ct. 189; *People v. Hairston* (1970), 46 Ill.2d 348." (Emphasis added.)

The Supreme Court then added that "the assumption upon which the appellate court majority considered the case failed to take into account the problems that confronted the jury." Those problems (namely, the jury was given only two forms of verdict for the three-count indictment; the accountability instruction was given in the abstract and was not related to the instruction dealing with the essential elements of murder; the murder instruction could have been construed to require a finding that Dawson performed the acts which caused the death of the attendant and that, when Dawson did so, *he* had the intent to kill or to do great bodily harm to the attendant) might also account for the inconsistent verdicts. The Supreme Court then concluded: "The 'inconsistency' upon which the appellate court reversed the defendant's conviction of armed robbery was therefore nonexistent, and for that reason the judgment of the appellate court is reversed."

We emphasize that our Supreme Court said that, even considering the case as though it involved *only* the matter of a verdict of not guilty of felony-murder under the accountability statute and a verdict of guilty of the same forcible felony involved, it did not agree with the appellate court majority's reasoning because it thought that the appropriate consideration was that the jury may have acquitted Dawson of felony-murder because the jury believed that its conviction of Dawson for the armed robbery provided sufficient punishment for what Dawson had done, and that that consideration forbids allowing the acquittal to upset or even to affect the simultaneous conviction. The jury's historic power of lenity must prevail, not only over the risk of an occasional compromise conviction of the lesser crime, but also over the traditional doctrine concerning legally and logically inconsistent verdicts. Moreover, this basis for our Supreme Court's decision in *Dawson* becomes even more significant in view of the fact that the appellate court's majority opinion in *Dawson* expressly referred to the line of authority holding that con-

sistency in verdicts is not necessary (*People v. Dawson* (1974), 19 Ill.App.3d 150, 157, 310 N.E.2d 800, 805), for which line of authority it cited *Dunn v. United States* (1932), 284 U.S. 390, 76 L.Ed. 356, 52 S.Ct. 189.[4] The *Dunn* case was cited and followed in *Carbone*, and *Carbone* was then cited and followed by our Supreme Court in *Dawson.*

■■ As we have already noted, in the instant case, unlike the usual situation in which there is a verdict or finding of not guilty of the greater offense but guilty of the lesser offense, here we have a verdict of guilty of the greater offense of the murder of John Sterling but not guilty of the lesser offenses of aggravated battery of three other wounded patrons of the Wonder Club, where all of the offenses arose from the same set of facts. In the instant case, therefore, it is even more apparent than in the usual situation that the jury may have acquitted defendants of the aggravated batteries because it thought that its conviction of defendants of the murder of John Sterling provided defendants with sufficient punishment for what they had done. The jury's acquittal of defendants of the three charges of aggravated battery may therefore well have been an exercise of the jury's "historic power of lenity." The jury may well have regarded the three counts of aggravated battery as *de minimis* in view of the conviction of murder. We note also that, where as here the conviction is for the greater offense, there is little, if any, risk that the conviction represents a compromise verdict.

In reliance, therefore, on our Supreme Court's decision in *Dawson,* we conclude that the acquittals do not affect the conviction and that neither legal nor logical consistency of verdicts is now required in Illinois.[5]

We turn now to the common contention of each defendant that the evidence adduced by the State was not legally sufficient to prove him guilty of the murder of John Sterling beyond a reasonable doubt.

One of the two murder counts of the indictment was based on section 9-1(a)(2) of the Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 9-1(a)(2)). That paragraph provides that a person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death, he knows that such acts create a strong

---

[4] The appellate court majority did not follow this line of authority; rather it followed prior Illinois decisions adopting the view that verdicts had to be at least legally consistent.

[5] We point out that the lesser offenses involved in the instant case were not lesser included offenses. We have therefore no occasion to decide, and we do not decide, whether the *Dawson* doctrine dispensing with the requirement of legally consistent verdicts extends to situations in which the lesser offenses of which a defendant is acquitted were lesser included offenses within the greater offense of which a defendant is found guilty.

538

probability of death or of great bodily harm to that individual or another. The defense was that the defendants were not the two men who did the shooting in the Wonder Club on the night of 17 April 1970. We focus, therefore, on the identification testimony adduced by the State and on the identification testimony adduced by defendants and on the alibi testimony separately adduced by each defendant.

For the State, Liddell, as an eyewitness to the shooting, standing at that time 9 feet away from Dillon and 4 feet away from Murray, in court positively identified Dillon and Murray as the shooters of automatic weapons and as the same two men who had been in the Club a short time earlier that night. In court, he also identified State's Exhibits 7 and 8 as a photograph of each defendant which he had picked out from about 100 police photographs shown to him at the police station a short time after the shooting. He had given a description of each man at the police station, where the police had first asked him for a description; he had described one man as a male Negro wearing a light jacket and the other man as a male Negro wearing a dark jacket. He had told the police that he had seen the men before, but he had not told the police that he knew them; he did not know either man by name, though he had seen Dillon in the Club several times and had even cashed paychecks for him.

Tolbert in court positively identified Murray, whom he had never seen before that night, as the young-looking man who had been in the Club a short time before the shooting and who had left the Club after telling Tolbert that he had no I.D. card. Tolbert then identified Murray as the man who had reentered the Club shortly afterwards, accompanied by Dillon. Dillon, whom Tolbert had not previously seen in the Club on that night, had a gun by his side; Tolbert recognized Dillon, whom he had seen before but whom he did not know by name, by a headband Dillon was wearing. Tolbert did not see any gun on Murray. When Tolbert had seen Dillon with the gun, Tolbert had backed behind the bar at the rear of the Club; he had, therefore, not seen who fired the shots, but the first shot fired had come from the area of the Club where he had seen Dillon backing toward the front door. At the police station shortly after the shooting, Tolbert had identified police photographs of Dillon and Murray as photographs of the two men who had been at the Club at the time of the shooting; the State's Exhibits 7 and 8 were two of the photographs he had then identified. He had never been asked by the police for descriptions of the two men, but at the trial he described Murray's clothing, black hair, and prominent eyes.

Barbart Kent identified Murray, whom she had never seen before, as a person she saw speaking with Tolbert on that night before the shoot-

ing; Tolbert was asking Murray for identification. She did not see Murray with a gun on that night, did not see Dillon at all on that night, and did not see who fired the shots.

Neither Robert Chatmon nor Tommie Akins had seen who shot him, and could not identify either defendant as having been present in the Club on that night.

Wilbert Norman did not know who had done the shooting. He had never seen either defendant prior to the day he testified at the trial, though he had worked as a bartender in the Wonder Club for 2½ years.

Officer Noga testified that Liddell's description of the man whom Liddell had subsequently identified as Dillon had been a bit more detailed than Liddell had testified, in that Liddell had mentioned that the man was 6 feet tall and was wearing a dark headband. Noga had found one .25-caliber cartridge casing and one .9-mm. cartridge casing on the floor of the Club; the casings were about 20 feet apart from each other, one toward the middle of the Club and one between the front end of the bar and the front door.

Each defendant presented a separate alibi defense. For Murray, Christine Kent, a friend of Irene Gurley, testified that she, Irene Gurley, and Murray had been together at the Gurley home and the Blue World from 6:30 p.m. on 17 April 1970 until 12:30 a.m. on 18 April 1970, when she had left the Gurley home with Irene Gurley and Murray still there. Irene Gurley corroborated the testimony of Christine Kent except that it might have been as late as 9 p.m. on 17 April 1970 when Murray had first arrived at her home. Murray had always treated her just like a mother since she had first met him through her oldest son, who was about the same age as Murray.

For Dillon, his sister Shelma and Eugene and Jeanette Fields testified that she and Dillon had been visiting the Fields in Cincinnati, Ohio, from the evening of 16 April 1970 to the day of 19 April 1970, having been invited to do so and to stay at the Fields' home by Eugene Fields for the purpose of helping to celebrate Jeanette Fields' birthday, which was 17 April 1970.

Cosette Armstrong testified that she had seen the two men who had been ejected from the Club before the shooting; that she had later seen the same two men when her attention was drawn to them by one of her friends who said: "There's those fellows and they have guns"; that she had not actually seen the shooting because she had looked away from the two men so that they would not see her looking at them; and that the shooting had begun as she looked away. The two men looked nothing like the defendants; she was positive that neither defendant was either one of those two men. She had not known either defendant prior

to 17 April 1970, and did not know either of them at the time of her testimony. She could describe and identify the two men, but she would not describe them for fear of reprisal.

Johnny Nelson noticed that two men had been ushered out of the Wonder Club before the shooting by a short, heavy bartender who "manhandled" one of them. Nelson did not know either one of the two men and did not know what either one looked like, because he had simply casually noticed them. He had never seen either defendant prior to testifying at the trial, but neither defendant was either of the two men who had been ushered out. A short time later, two men had come into the Club with guns and shooting followed. Nelson could not say whether they were the same two men who had been ushered out; on cross-examination, Nelson stated that he could not say whether he saw the men who did the shooting. He could not describe either of the two men who had been ushered out or either of the two men who had done the shooting, but neither defendant was one of any of those men.

Oliver Emerson did not see the face of either of the two men whom he had heard Tolbert ask to leave the Club. He could not describe either of those two men. He did not see who had done the shooting, so he could not say that either defendant had been shooting in the Wonder Club that night.

In summary: Liddell, as an eyewitness, positively identified the defendants as the two men who had been in the Wonder Club on 17 April 1970 shortly before the shooting, and who had reentered the Club shortly after leaving and had begun shooting with automatic weapons. Officer Noga had found two cartridge casings of different calibers on the floor in the front half of the Club, indicating that two automatic weapons had been fired in the Club that night. Tolbert, as an eyewitness, positively identified Murray as the young-looking man without an I.D. card whom he had asked to leave the Club, and who had reentered the Club shortly thereafter accompanied by Dillon. Tolbert had not seen Murray with a gun, but he positively identified Dillon as having had a gun by his side when he entered with Murray. Tolbert had not seen who fired the shots, but the first shot had come from the area of the Club where he had seen Dillon backing toward the front door. Barbara King positively identified Murray as the person whom Tolbert was asking for an I.D. card on that night, shortly before the shooting.

For the defense, Cosette Armstrong testified that the two men who had been ejected were the same two men who had then reentered and who, according to her friend, then had guns; she was positive that neither defendant was either one of those two men; those two men looked noth-

ing like the defendants. While Johnny Nelson could not say that the two men who had entered the Club with guns were the same two men who had been ushered out shortly before the shooting, and while he could not describe either of the two men who had been ushered out or either of the two men who had then come in with guns, neither defendant was one of any of those men. For Murray, Christine Kent and Irene Gurley presented substantially consistent alibi testimony. For Dillon, his sister Shelma and Eugene and Jeanette Fields presented consistent alibi testimony.

■■ From this review of the evidence, we conclude that the identification testimony for the State, if believed, is sufficient to prove defendants guilty of the shooting beyond a reasonable doubt. This is not a case in which the evidence for the State is merely circumstantial. The direct conflict of identification testimony by occurrence witnesses and the credibility of the respective occurrence and alibi witnesses are matters which it is the function of the jury to determine. See, e.g., *People v. DeArmond* (1972), 5 Ill.App.3d 831, 284 N.E.2d 474, and cases cited therein.

Defendants call particular attention to portions of the testimony of three defense witnesses: (1) Johnny Nelson testified that, during the shooting, Tolbert, standing in the rear of the Club a few feet away from the witness and just back of the rear entrance to the area behind the bar and facing toward the front of the Club, fired one shot from a pistol. (2) Cosette Armstrong testified that, during the shooting, she saw a flash from the rear of the Club. (3) Oliver Emerson testified that, in the interval between the time when two men went out of the Club after an argument in the rear about somebody being too young and the time of the shooting, Tolbert asked for and received a pistol from a bartender behind the bar. Based on this testimony, defendants contend that the likelihood that Tolbert killed John Sterling creates a reasonable doubt that defendants killed him.

But there was relevant contrary testimony for the State: (1) Tolbert denied that he had a gun until after the shooting was over, and denied having fired the gun at all on the night of the shooting. (2) Detective Creighton testified in rebuttal that, when he was at the hospital in an attempt to interview John Sterling, he saw and tried to question Oliver Emerson, but Emerson's answers were not responsive; from that fact and from an odor emanating from Emerson's person, the witness was of the opinion that Emerson was then intoxicated. (3) Robert Chatmon testified that he was in the aisle about 9 feet away from the front of the Club and was heading for the rear of the Club when he was shot in the thigh above his left knee.

Once again, the matter of the credibility of witnesses is for the jury. ▮▮ On this state of the total evidence, we cannot say that defendants were not proved guilty beyond a reasonable doubt.

One of the additional contentions of Dillon in this appeal is also somewhat related to the inconsistent verdicts, though it is primarily based on facts which we have not as yet had occasion to recite. During closing argument by counsel for Murray, a person being tried in a courtroom across the corridor from the courtroom in which the instant defendants were being tried attempted to escape. As a result, an alarm system rang for over 4 minutes, several shots were fired in the corridor, and the escapee was killed. The jury trying the instant defendants heard the shots and the uproar, but no part of the disturbance took place in their presence or in the courtroom in which they were sitting. The trial judge immediately sent the jurors into the jury room, where they remained until order was restored. Before the jurors returned to the courtroom some 30 minutes later, counsel for Dillon made a motion for a mistrial owing to the disturbance and interruption. Counsel for Murray objected to the motion. The motion was denied. The State then moved for a mistrial, which motion was denied. The jury then returned to the courtroom. Thereupon, the trial court addressed the jury collectively and asked whether any member of the jury felt that the disturbance would in any way affect his or her judgment in the case. No member of the jury made any response, whereupon the trial court directed counsel for Murray to continue his closing argument; additional time was accorded to counsel, should he wish to summarize the portion of his argument which he had given before the interruption. In Dillon's post-trial motion for a new trial, his counsel assigned as error the trial court's denial of the motion for a mistrial, on the ground that the denial of the motion was an abuse of discretion by the trial court; and he urged that the inconsistent verdicts were evidence of the jury's confusion as a result of the disturbance in the hallway and the interruption of the trial. The court denied the post-trial motion. Dillon now contends that it was an abuse of discretion for the trial court to have denied his motion for a mistrial. He relies primarily on the decision of the United States Supreme Court in *Lisenba v. California* (1941), 314 U.S. 219, 86 L.Ed. 166, 62 S.Ct. 280, that a trial held in a mob atmosphere violates a defendant's right to due process of law.

▮▮ We do not think the *Lisenba* case is apposite. Rather, the decision of our Supreme Court in *People v. Long* (1968), 39 Ill.2d 40, 233 N.E.2d 389, is more closely in point. In *Long,* a prisoner escaped from custody, ran into the courtroom in which Long was being tried, and disrupted the trial. As in the instant case, the trial court took prompt corrective

action to assure that the trial was conducted in an orderly manner. Our Supreme Court held that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. The disruption of the trial in *Long* was at least as serious and dramatic as the disruption in the instant case, and in the instant case the trial court promptly elicited the assurance of each juror that the disruption would not affect his or her judgment. It is true that in *Long* there were no inconsistent verdicts. Here there were, and Dillon contends that they demonstrate the jury's confusion and panic as a result of the disruption of the trial. At best, this suggestion is speculative. And, as we have already noted above, the inconsistent verdicts are readily explicable as an exercise of the jury's historic power of lenity. Under these circumstances, we cannot say that the trial court abused its discretion in denying the motion for a mistrial.

The final contention of Dillon is again based on circumstances which we have not as yet had occasion to recite. Over Dillon's objection on *voir dire*, the trial court read to the prospective jurors a list of all potential witnesses who might testify at the trial. The list contained the names of the potential witnesses for the State and for each defendant without indicating the party in whose behalf each potential witness might testify. Dillon contends that the reading of the said undifferentiated list to the prospective jurors had the following objectionable consequences:

(1) If a person listed as a potential witness did not then in fact testify, the jury might assume that that witness was a witness for one or both of the defendants, and might then infer that the witness had not been called to testify because his or her testimony would have been adverse to one or both of the defendants. As a result, Dillon had been improperly saddled with a burden of explaining the absence of any listed potential witness who did not in fact testify, in order to dissipate the jury's potential assumption and inference.

(2) If a person listed as a potential witness was a witness for the State whom the State then did not call to testify, Dillon would have lost the potential that the jury might infer that the State had not called the witness because his or her testimony would have been adverse to the State.

The case on which Dillon relies to support this contention is *Wardius v. Oregon* (1974), 412 U.S. 470, 37 L.Ed.2d 82, 93 S.Ct. 2208. But *Wardius* simply holds that, where a State on discovery requires a criminal defendant who intends to interpose an alibi defense to submit a list of his alibi witnesses, the State must accord to the defendant a right to the reciprocal discovery of potential State witnesses who might be

called to rebut the alibi defense. The case does not involve the reading of an undifferentiated list of all potential witnesses to prospective jurors on *voir dire*.

■■■ Moreover, the rule in Illinois is that, in a criminal prosecution, the State is not required to call every witness available to prove its case, and no inference adverse to the State may be drawn from the State's failure to call an available witness. (See *People v. Woods* (1969), 114 Ill.App.2d 348, 356, 252 N.E.2d 717, 721 (involving an alibi defense and an issue as to identification).) The same rule obtains as to a defendant. In *People v. Garnett* (1969), 113 Ill.App.2d 159, 167, 251 N.E.2d 761, 764, this court stated:

> "Generally, an accused is under no obligation to call witnesses and his not doing so does not raise the presumption that if called, the witness would have testified unfavorably to the accused. [Citations.] When, however, the defendant injects into his case his activities with potential witnesses during a particular period of time to establish an alibi, his failure to produce such witnesses is a proper subject of comment on the part of the State. [Citations.]

Since the indicated exception to the general rule is inapplicable in the instant case, the general rule applies. We conclude that this final contention of Dillon has no merit.

For the foregoing reasons, in No. 58138, we affirm the judgment of conviction of Treadest Murray for the murder of John Sterling, entered by the circuit court of Cook County upon the verdict, and, in No. 59174, we affirm the judgment of conviction of Samuel E. Dillon for the murder of John Sterling, entered by the circuit court of Cook County upon the verdict.

In No. 58138, judgment is affirmed.

In No. 59174, judgment is affirmed.

DOWNING, P. J., and LEIGHTON, J., concur.