THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR PEARSON, Defendant-Appellant.

(No. 57297;

First District (5th Division)—December 14, 1973.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins and John T. Moran, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Jerald Kessler, Kenneth L. Gillis, Sharon Hope Grossman, and Frank Deboni, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

Defendant was charged with two counts of aggravated assault (Ill. Rev. Stat. 1971, ch. 38, par. 12—2(a)(1)) and two counts of armed violence (Ill. Rev. Stat. 1971, ch. 38, par. 33A—2). All four counts arose out of the alleged firing of a handgun at two police officers. After a bench trial, defendant was found guilty of each count of aggravated assault and not guilty of each count of armed violence. He was admitted to two years' probation.

Defendant's sole contention on appeal is that under the particular facts of this case the findings of not guilty and guilty are "legally inconsistent" and that his convictions therefore cannot be allowed to stand.

EVIDENCE

Peter F. Dignan, a police officer, testified that he was assigned to a beat patrol on August 20, 1971, when at approximately 3:30 A.M. he received an assignment to investigate a disturbance. He and his partner were in uniform and were driving a marked police car. When they arrived at 7146 S. Greenwood pursuant to the call, he was met by two women, Edith Robinson and Princey Gator, who stated that they had just been assaulted in the residence at that address.

There were no cars parked in front of the residence, but there was a car parked across the street and only a short distance away. It was not brought to the witness' attention until later that the windows of the parked car had been broken.

He and his partner, John Burge, climbed the steps of the residence. The front door is approximately seven feet tall by three and one-half feet wide. The door consists of a pane of glass on the top, about three by two and one-half feet. There was a curtain that partially covered the middle portion of the glass.

He knocked on the window, announced his office, and ordered the person inside to come out. There was no response. The front room of

the residence was lit up, and it was dark outside, but he did not see anyone inside. After he announced his office three or four times, he observed a person entering the front room about 15 feet away from him carrying what he believed to be a revolver. He was able to get a clear view of his face. He identified defendant as that person. He ordered defendant, who approached the door, to drop the gun. His partner shined a flashlight in the window, and the officers stepped to the sides of the door. Defendant came to the door, pulled the curtain aside, and fired one shot through the window. The witness returned the fire with three shots. The officers entered and saw defendant lying on the floor with a Colt .38 revolver at his feet. The cylinder of the weapon had five live cartridges and one spent one. Defendant had been shot.

He authenticated People's Exhibits No. 1 (the revolver just referred to), No. 2 (five live cartridges and one spent one), and No. 3 (an inventory slip) which were subsequently admitted into evidence.

John Burge, a police officer, testified in essential corroboration of the evidence given by his partner, Officer Dignan. He testified further that after defendant fired his gun at them through the door, they returned the fire. He fired four shots and his partner fired three. He called a squadrol, and they proceeded into the house where they saw defendant lying on the floor with the weapon at his feet. He did not see anyone in the house other than defendant. He also identified People's Exhibits Nos. 1, 2, and 3.

William Austin testified for the defense that he has known defendant for six years as his neighbor and that defendant has a good relationship with all the people in the community. Defendant's building is directly across the street from and facing his building.

On August 20, 1971, at about 3:00 A.M., he was in bed when he heard noise outside. He sat at the window to watch and saw defendant and friends go into the house. Around 10 or 15 minutes later he heard a noise in the house as if someone were breaking up furniture. The ladies came out of the house hollering and screaming. They came across the street to defendant's car, which was parked in front of the witness' window. One lady broke the front window of the car, and a heavy lady picked up a stone and threw it in the back window. Later the young girl took a match and tried to set the car on fire. He identified Defendant's Group Exhibit No. 1, a series of photographs of the damaged automobile which he had taken.

He immediately got up and called the police. The police came, and the ladies ran up to them and told them that defendant had a gun. The officers approached the front of defendant's dwelling. One officer took a position on the south side of the door, and the other stood on the north

side. Then the witness saw some type of light. An officer kicked on the door and said, "police officers." For a split second the witness saw guns flashing. He could not see defendant inside the house when the shots were being fired from the outside. If defendant were firing from the inside, the witness wouldn't have been able to see him. The officers raced into the house. He heard one officer scream, "freeze." After they brought defendant out in handcuffs, the witness went out, walked among the crowd, grabbed an officer's hand, and smelled the barrel of the gun. He said, "This gun hasn't been fired."

He owns a gun and has fired it outside. He has been present when other people have fired guns outside and has heard .38-caliber guns being fired. His building is the same height above ground level as that of defendant. No shots entered his building.

Arthur Pearson, defendant, testified that he had been living at 7146 S. Greenwood for about five years. On August 20, 1971, he brought two "big" ladies to the house; they were going to rent the property. They got him scared, knocked him down, and hit him on the side of the head. He got loose from them, ran downstairs, got his gun, and put them out of the house. They tore his car as he was standing in his yard looking at them. He came back, called the police, and put his gun on the cocktail table in the front room, the living room.

The officers came to the window, knocked on the door, and said, "police officers." He got up, came to the door, and had his left hand over the door. He saw the officers, who were in uniform. They couldn't have seen him well because the light was dim in the dining room and there was no light in the living room. He has three or four different burglar chains on the door. He saw both officers at his door during the 30 seconds to one minute it took for him to take the chains off. The officers said, "police," and came in shooting and kicking the door. They said, "freeze." The officers started to fire into the glass part of the door. They shot him once in the foot. He turned, and they struck him once in the back of his leg. He was struck in the back. His gun, which he identified as People's Exhibit No. 1, was on the cocktail table. He did not point his weapon at either Officer Burge or Officer Dignan, nor did he fire it at either of them. He heard the police say it had been shot twice.

He identified Defendant's Group Exhibit No. 2, a series of photographs of the scene of the occurrence, and it was admitted into evidence.

Princey Gator testified for the State in rebuttal. She was at 7146 S. Greenwood on August 20, 1971, with Edith Robinson, two other women, defendant, and two other men. She was 5'8" in height and weighed 185 pounds. There was an argument, and she left the apartment. She saw

the police on the street and had a conversation with them. They then got out of their car, took their guns out, and went up to defendant's door. She was told to stay back. She heard the officers identify themselves in a loud voice and tell the man to drop his gun and come out. Then she heard a shot or so and a pause, and then a number of shots. When she went back up to the door, defendant was lying on the ground.

OPINION

■■ At the outset, we note that most of the cases treating the problem of inconsistent findings of fact apply rules that developed with respect to jury verdicts. (Annot., 18 A.L.R.3d 259.) The instant appeal, however, concerns the findings of a judge after a trial without a jury. It has been held in this regard that a reviewing court's reversal because of inconsistency is more readily available as to a bench trial than to a case tried to a jury. (*People v. Hyman*, 8 Ill.App.3d 382, 290 N.E.2d 627.) But since we find reversible error under the standard applied to jury verdicts, discussion of any relevant distinctions between bench trial and jury trial is not necessary to our present decision.

Jurisdictions differ as to what constitutes inconsistent verdicts and what the consequences of inconsistency should be. (See Annot., 16 A.L.R.3d 866, and 18 A.L.R.3d 259.) Our Supreme Court resolved some of these issues in *People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840, when it held that the judgment entered on guilty verdicts on two charges of solicitation (to murder) would not be set aside despite the fact that the same jury found defendant not guilty of two charges each of murder and attempted murder arising from the same incidents. After discussing the conflicts among the cases in other jurisdictions in their treatment of inconsistent verdicts, the court set forth the rule that Illinois courts have adopted: where the verdicts inconsistently acquit and convict of separate crimes arising from the same act, logical consistency in the verdicts is not necessary, so long as the verdicts are not legally inconsistent. The court then approved the proposition that "[i]n law there is no inconsistency in verdicts of acquittal and conviction upon charges of *crimes composed of different elements*, but arising out of the same state of facts." (Emphasis added.) 46 Ill.2d at page 362.

In order to determine whether the crimes charged against the instant defendant—aggravated assault and armed violence—are composed of the same or different elements, it is necessary to consider not only the statutory definitions of those crimes, but also the proof adduced by the State at this particular trial. The statutory elements of armed violence, of which defendant was found not guilty, are that defendant performed "an act prohibited by [section 12—2 (aggravated assault)]" "while armed with a dangerous weapon." (Ill. Rev. Stat. 1971, ch. 38, par.

33A—2.) The elements of aggravated assault include the elements of assault, Ill. Rev. Stat. 1971, ch. 38, par. 12—1, plus one of the ten factors of aggravation—in this case the use of a deadly weapon—set forth in ch. 38, par. 12—2(a). The elements of assault as pertinent to this case are that the defendant "[1] without lawful authority" "[2] engages in conduct [3] which places another in reasonable apprehension of receiving a battery," i.e., "bodily harm." Ill. Rev. Stat. 1971, ch. 38, par. 12—3(a).

On the evidence presented to the trier of fact, there is no possible factual basis for proving that defendant placed another in reasonable apprehension of receiving a battery other than the testimony that defendant had a gun in his possession. According to undisputed testimony, the victims of the alleged assault were standing on the other side of a locked door when the alleged assault occurred. Hence, to support the finding of even a simple assault, the trial judge must have believed beyond a reasonable doubt that defendant was "armed with a dangerous weapon." In fact, the judge's comment that "it's a very serious crime, and shooting a gun at a police officer under any circumstances is a serious crime," indicates that he believed the defendant did fire a shot at the policemen.

■■ Thus having found that defendant committed the aggravated assaults, the trial judge necessarily found that defendant was in possession of a dangerous weapon, his gun. If so, defendant committed aggravated assaults "while armed with a dangerous weapon"; i.e., defendant committed armed violence. Because of the facts of this case, then, the elements of aggravated assault and armed violence are identical, and the proof that would suffice to convict for one offense, being precisely the same, would equally support conviction of the other. The findings of not guilty of armed violence and guilty of aggravated assault are therefore "legally inconsistent," and the convictions may not stand. See People v. Hairston, 46 Ill.2d 348, 263 N.E.2d 840; People v. McCollough (Trapp, J., specially concurring), 8 Ill.App.3d 963, 291 N.E.2d 505.

In Illinois, "where inconsistent verdicts of guilty were returned on separate indictments or separate counts of a single indictment * * * a reversal and new trial must follow." (Emphasis added.) People v. Hairston, 46 Ill.2d 348, at page 361, 263 N.E.2d 840.) It is apparent, however, that this rule does not furnish the complete answer to the issue now before us as to the consequences of inconsistent findings of guilty and not guilty, with particular reference to remand for a new trial. We therefore believe that our conclusion must also be based on that part of the fifth amendment to the United States constitution which prohibits double jeopardy.

██ The 1970 Illinois constitution provides that there shall be no appeal from a judgment of acquittal after a trial on the merits in a criminal case. (Ill. Const. art. VI, sec. 6.) Thus the judgments of not guilty of armed violence are not before this court. They stand as valid and final judgments. The United States Supreme Court has held that collateral estoppel is embodied in the fifth amendment guarantee against double jeopardy; this means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189.) The disputed issue of ultimate fact as to both charges against this defendant at the trial below was whether he had fired a gun at the police officers. The not guilty findings indicate that the State failed to prove beyond a reasonable doubt that he had. A new trial on the charges of aggravated assault would raise this issue of fact again and would unconstitutionally require an accused who had been acquitted to "run the gauntlet" a second time. 90 S. Ct. at 1195. See also *People v. Brown*, 99 Ill.App.2d 281, 241 N.E. 2d 653.

Because the findings are legally inconsistent and a new trial on the charges of aggravated assault is barred by collateral estoppel as a form of double jeopardy, the convictions must be reversed.

Reversed.

LORENZ and SULLIVAN, JJ., concur.