THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DEATHRICE JIMERSON, Defendant-Appellant.

First District (4th Division) No. 77-648

Opinion filed February 22, 1979.

Lucas T. Clarkston, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Iris E. Sholder, and Larry J. Acker, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Deathrice Jimerson, was charged in a multicount indictment with armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), attempt murder (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4, 9—1) and aggravated battery (Ill. Rev. Stat. 1975, ch. 38, par. 12—4). At the conclusion of a jury trial in the circuit court of Cook County, defendant was found guilty of aggravated battery and sentenced to three years probation, the first year to be served on a work release program. On appeal, defendant contends: (1) his aggravated battery conviction is legally and logically inconsistent with his acquittal of armed robbery and attempt murder; and (2) the State's failure to call a particular witness to the alleged occurrence deprived him of a fair trial.

We affirm the trial court.

Prior to the selection of the jury, the State presented a motion *in limine* to prevent defendant from utilizing as substantive evidence at trial, the fact that Erskine Green, the alleged victim of the attempt murder count, had a criminal record and was being held in Cook County jail on an armed robbery charge. After hearing arguments of counsel, the trial

court granted the State's motion, holding that the above evidence could only be used by the defendant at trial to impeach Green's credibility, if and when Green took the stand.

At trial, Derrick Brooks testified that on June 26, 1975, at approximately 3 a.m., he was eating a sandwich in his second floor apartment. As Brooks glanced out his apartment's front window, he saw Erskine Green, a tenant from the floor below, walking his dog. Brooks also observed a man, later identified as the defendant, sitting with two women in a maroon and black automobile parked down the street.

Upon finishing his sandwich, Brooks walked downstairs and engaged in a conversation with Green near the front door of the apartment building. Approximately 10 minutes elapsed, when the defendant approached Green and Brooks and told them he had just been robbed. The defendant requested their help in looking for some papers he lost in the course of the robbery.

Brooks testified that following a brief search of the area, he and Green found some cards and a piece of paper in a gangway next to Brooks' apartment building. After Brooks and Green handed this material to the defendant, the three men walked toward defendant's automobile which was parked nearby.

When they reached the automobile, defendant told Brooks and Green that he had had trouble starting the engine. Brooks testified that he and Green volunteered their services in attempting to get the car started. Green began working on the battery while Brooks tried to insert a fuse in the trunk wiring system. After the three men had worked on the car unsuccessfully for about an hour, the defendant asked to use a telephone.

The three men walked to Green's apartment and entered the kitchen where Green's wife and two children were playing. Brooks testified that after defendant mistakenly dialed the wrong number, defendant handed the telephone to Green and asked Green to dial. As defendant called out the numbers, Green's wife wrote them down on a piece of toilet tissue.

Brooks testified that defendant talked to a woman named "Bell" for approximately 10 minutes. Brooks also stated that during the course of the conversation he heard defendant tell "Bell" to "bring the heavy stuff." When the phone call ended, the three men left the apartment and walked back to defendant's automobile. Brooks and Green resumed working on the engine in a further attempt to get the car started.

Brooks asserted that approximately 15 minutes had elapsed, when a blue GTO turned the corner and pulled up alongside defendant's automobile. Brooks, Green and the defendant were all standing on the passenger side of the GTO when it stopped. Brooks stated that when defendant walked over to the driver's side of the GTO, a woman passenger handed the male driver a gun. The driver of the GTO in turn

handed the gun to defendant, who then pointed it at Brooks and Green, ordering them to place their hands on top of the car. Green and Brooks complied.

As defendant began searching Green's pants pockets, Brooks' mother screamed out the second floor apartment window. When defendant turned and shot at the window, Brooks yelled that he was shooting at his mother. Brooks testified further:

"A. Then [the defendant] tried to turn around and shot me.

Q. Where did he shoot you?

A. In the neck.

\* \* \*

Q. And where did it exit?

A. In the back."

The court noted that Brooks had a scar approximately an inch below his earlobe and another scar on the back of his neck. Brooks testified that after he shot, defendant jumped "in his car" and drove off.

When the police arrived on the scene shortly thereafter, Green's wife handed an officer the phone number she had written down on the piece of tissue. Brooks was rushed to Mount Sinai Hospital. Brooks identified the defendant from a lineup the police conducted 10 or 11 days following the shooting. Brooks also identified the defendant in court.

On cross-examination, Brooks testified that one of the papers defendant requested help in finding was an airline ticket. Defendant mentioned to Brooks that he needed the ticket because he worked out of town. Brooks also testified that one of the papers Green and he found in the gangway had defendant's name on it. Brooks stated further that it was about 3:45 a.m. when defendant first approached him and Green, and about 5 a.m. when the shooting occurred.

Josephine Brooks, Brooks' mother, testified that on June 26, 1975, at approximately 3 a.m. she was lying in bed awake when Brooks walked downstairs to talk to Green. Josephine glanced out the apartment window about 20 minutes later, and saw Brooks and Green standing in front of the building talking.

Josephine lay down and dozed off for about 45 minutes. When she awoke she walked over to the window to call Brooks back into the apartment, but she did not see him in front of the building. Josephine looked down the street and saw Brooks and Green, their hands in the air, standing beside two parked cars near the intersection of Christiana and Roosevelt. A third man, whom Josephine could not identify because of darkness, stood behind them.

Josephine testified that when she screamed to members of her family who were sitting in the kitchen, the man standing behind Brooks and Green turned and shot at the window. As Josephine threw herself to the

floor, she heard another shot fired. After some seconds had passed, Josephine ran out of the apartment into the hallway where she saw Brooks holding his neck.

Josephine testified that when the police arrived shortly thereafter, Green's wife handed an officer a piece of toilet tissue. Josephine also stated that she accompanied her son in the ambulance to Mount Sinai Hospital.

The State called as its next witness Police Officer Raymond Soltys, an investigator for Area 4, robbery. Officer Soltys testified that on June 26, 1975, at approximately 5 a.m. he was called to investigate a shooting in the area of Roosevelt and Christiana. During the course of the on-the-scene investigation, Officer Soltys received a telephone number, 779-6692, and a description of a Chrysler automobile (black top, maroon body) with license plates WX2998.

Officer Soltys discovered that the phone number was registered to a Deathrice Jimerson who resided at 1634 West 93rd Place. On July 7, Officer Soltys searched the area around this address and found a Chrysler automobile matching the maroon and black description previously furnished him. The car bore license plates WX4988. After running a check on the automobile and finding it registered to Deathrice Jimerson, Officer Soltys placed defendant under arrest for the shooting of Brooks. On the way to the police station, Officer Soltys advised defendant of his Miranda rights whereupon defendant stated he had no knowledge of a shooting near Christiana and Roosevelt and also claimed he was unfamiliar with the west side of the city.

After arriving at the police station, defendant was placed in a room with two investigators. He again denied knowledge of the shooting and again claimed unfamiliarity with the city's west side. Defendant was subsequently placed in a lineup and identified by both Brooks and Green.

During cross-examination, Officer Soltys testified that he had received the telephone and license plate numbers from another officer who had been at the scene of the shooting. Officer Soltys also stated that he could not recall defendant ever claiming that Brooks and Green had in fact robbed him. On re-cross-examination, Officer Soltys testified that it was Evelyn Pertis who had provided the police with the license plate number. Defense counsel directed Officer Soltys' attention to his police report which stated that Ms. Pertis was with Brooks and Green when they had their initial contact with the defendant.

At the close of the State's case, the defendant presented a motion for directed verdict as to the armed robbery charge. The motion was granted.

The defense called as its first witness Addie Lee, an acquaintance and friend of the defendant. Addie Lee testified that on June 26, 1975,

defendant was playing cards at her home from 9 p.m. until 2:30 a.m. She stated further that defendant did not drink any alcohol that night, and to her knowledge, never drank alcohol.

Willie Belle Jimerson, defendant's wife, testified that she lived with her husband and their five children at 1634 West 93rd Place. She also testified that on June 25 at approximately 5 p.m. defendant informed her he was going to Addie Lee's house to play cards. The next time Mrs. Jimerson saw the defendant was the morning of June 26, when she answered the front door bell at 3:45 a.m.

Mrs. Jimerson stated that when she opened the door defendant appeared shaken and upset. She also testified that defendant told her the car's engine had died on the way home and he had been robbed of over $200 by two men. Mrs. Jimerson asserted that, as a result of the robbery, defendant's billfold was torn in half and his back pocket was ripped. She admitted that her home telephone number was 779-6692 but she denied receiving a phone call between 3 and 5 a.m. the morning of June 26.

On cross-examination, Mrs. Jimerson testified that defendant never called police about the two men who allegedly robbed him. She also stated that in June of 1975 defendant was on medical leave from his place of work and was receiving disability payments.

Defendant took the stand and testified that he played cards at Addie Lee's place from 8:30 p.m. June 25 until 2:30 a.m. June 26. Defendant stated that while driving home east on Roosevelt Road the morning of June 26, his car's dashboard and outside lights went out. When this occurred, defendant made a right turn off Roosevelt Road onto Christiana and stopped under a lamp post.

Defendant testified that as he was examining the engine, two men walked up and offered their help. According to defendant's testimony, one of these two men was Brooks. Defendant asserts that Brooks' unidentified partner shoved a gun into his ribs and ordered defendant to empty his front pockets. Defendant also testified that just as the robbery "was going down," a car drove past and the man holding the gun tried to hide the gun from view. Defendant took this opportunity to grab the gunman's wrist and a struggle ensued.

As the defendant and gunman fought, the third man, Brooks, pulled a wallet from defendant's pants pocket. Defendant testified that he lunged for and grabbed the wallet with his free hand. According to defendant's testimony, he held the gunman's wrist with one hand and the wallet with his other hand. During this struggle, the gun was fired a number of times and defendant's wallet was torn in half. Defendant testified that he was unaware if the shots that were fired hit anyone.

When the two robbers finally ran off, defendant jumped into his car, drove across a vacant lot onto Roosevelt Road and sped home. Defendant

stated that he arrived home "sometime" before 5 a.m. Defendant asserted further that he informed his wife of what had happened and told her that he had not called police.

Defendant testified that the alleged robbers took over $200 in cash as well as his driver's license, registration card, and identification card which contained a telephone number and directions to contact Mrs. Jimerson in case of accident. Defendant denied Brooks' entire contrary testimony concerning the chain of events which led up to the shooting.

Defendant testified that the first time he heard someone had been shot near the intersection of Roosevelt Road and Christiana was on July 7, 1975, when Officer Soltys came to his home and placed him under arrest. Defendant denied ever telling Officer Soltys that he was unfamiliar with the city's west side. Defendant also asserted that after he made bail on the night of July 7, he told Officer Soltys that it was he who was robbed on June 26.

On cross-examination, defendant contended that after he was robbed, he drove approximately 100 blocks without lights. Defendant also stated that when he was brought to the police station to participate in a lineup, he recognized Brooks but did not say anything about him to the police.

The State called Officers Lloyd and Soltys to testify in rebuttal. Officer Lloyd stated that he was on duty the morning of July 7 and was present when defendant was interviewed at police headquarters. Officer Lloyd heard defendant state that he had no knowledge of any shooting which occurred near Roosevelt Road and Christiana and also heard defendant claim that he was unfamiliar with the city's west side.

Officer Soltys testified that he was not on duty the night of July 7. He also denied having any conversation with the defendant, after defendant made bail.

Following the presentation of all the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of aggravated battery but not guilty of attempt murder. The trial court sentenced the defendant to three years probation, the first year to be served on a work release program.

Defendant appeals.

Opinion

I

Initially, defendant contends that his aggravated battery conviction is legally and logically inconsistent with his acquittal of armed robbery and attempt murder and, therefore, his conviction must be reversed. We disagree.

The traditional rule in Illinois required only legal, not logical,

consistency between verdicts of acquittal and conviction based upon separate counts of a single indictment. *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756; *People v. Pearson* (1973), 16 Ill. App. 3d 543, 206 N.E.2d 539; see *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

The legal consistency requirement was recently criticized by the Illinois Supreme Court in *People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, *cert. denied* (1975), 423 U.S. 835, 46 L. Ed. 2d 54, 96 S. Ct. 61. In *Dawson*, a gasoline service station attendant was robbed and shot to death by Hawkins. Although Dawson was not in the station at the time of the robbery and shooting, he was alleged to have been Hawkins' accomplice. Dawson was charged in a single multicount indictment with murder, felony murder and armed robbery. Following a jury trial, Dawson was acquitted of both charges of murder but convicted of armed robbery. On appeal, the Fourth District Illinois Appellate Court reversed Dawson's conviction, holding that the verdict of acquittal on the felony murder charge was legally inconsistent with the guilty verdict on the armed robbery charge. *People v. Dawson* (1974), 19 Ill. App. 3d 150, 310 N.E.2d 800.

The Illinois Supreme Court subsequently reversed the appellate court's decision and reinstated Dawson's conviction. The supreme court found the claimed "inconsistency" nonexistent because of confusion engendered in the jurors' minds by misleading instructions and verdict forms. However, the supreme court also pointed out that even if the verdicts had been legally inconsistent that would not have warranted the reversal of Dawson's conviction:

> " 'The very fact that the jury may have acquitted [the defendant] of one or more counts in a multicount indictment because of a belief that the counts on which it * * * [did convict the defendant would] provide sufficient punishment, * * * forbids allowing the acquittal to upset or even to affect the simultaneous conviction. * * * (I)f the rule were otherwise, the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others * * *. It is true, * * * that allowing inconsistent verdicts in criminal trials runs the risk that an occasional conviction may have been the result of compromise. But the advantage of leaving the jury free to exercise its historic power of lenity has been correctly thought to outweigh that danger. [Citations.]' " *People v. Dawson* (1975), 60 Ill. 2d 278, 280-81, 326 N.E.2d 755, 757, quoting *United States v. Carbone* (2d Cir. 1967), 378 F.2d 420, 422-23; see generally Annot., 18 A.L.R.3d 259 (1968).

Based upon the authority of *Dawson*, it is now recognized "that

neither legal nor logical consistency of verdicts is * * * required in Illinois." (*People v. Murray* (1975), 34 Ill. App. 3d 521, 537, 340 N.E.2d 186, 198; *People v. Hanrahan* (1978), 64 Ill. App. 3d 207, 380 N.E.2d 1075; *People v. Rudolph* (1977), 50 Ill. App. 3d 559, 365 N.E.2d 930; *People v. Morris* (1977), 49 Ill. App. 3d 369, 364 N.E.2d 377.) Consequently, even if we were to accept as correct, defendant's contention that his aggravated battery conviction is both legally and logically inconsistent with his acquittal of armed robbery and attempt murder, this inconsistency would not require the reversal of defendant's conviction.

Furthermore, defendant's contention would be of no avail even if considered under the former rule which required legal consistency between verdicts. Defendant's conviction of aggravated battery is legally consistent with both his acquittal of attempt murder and his acquittal of armed robbery.

■■ As a general rule, it is legally consistent for a jury to return verdicts of acquittal and conviction based upon charges of crimes composed of different elements, but arising out of the same set of facts. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) It is only when the verdicts, considered together, necessarily lead to a conclusion "that the same essential element or elements of each [distinct] crime were found both to exist and not to exist" that the verdicts are legally *in*consistent. *People v. Murray* (1975), 34 Ill. App. 3d 521, 531, 340 N.E.2d 186, 194; see, *e.g., People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539.

■■ To convict defendant of aggravated battery (Ill. Rev. Stat. 1975, ch. 38, par. 12—4), under the facts presented by this case, it was necessary for the State to prove that defendant intentionally and knowingly shot Derrick Brooks. To establish defendant's guilt of the crime of attempt murder (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4, 9—1), on the other hand, it was also necessary for the State to prove that defendant shot Derrick Brooks, but with a specific intent to kill. Since the charge of attempt murder required proof of an element not encompassed within the aggravated battery conviction, the two verdicts are legally consistent. *People v. Todorovic* (1977), 53 Ill. App. 3d 1, 368 N.E.2d 471.

■■ ■ Similarly, to convict defendant of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), it was necessary for the State to prove that defendant took money from Erskine Green (Ill. Rev. Stat. 1975, ch. 38, par. 18—1) while armed with a dangerous weapon. As already noted, the aggravated battery charge required proof that defendant intentionally and knowingly shot Derrick Brooks. It appears obvious that since the armed robbery charge, on which defendant was acquitted, required proof of an element not encompassed within the aggravated battery conviction, and since both offenses involved different victims, the two verdicts are legally consistent. *Cf. People v. Clark* (1976), 39 Ill. App. 3d

237, 350 N.E.2d 87; *People v. Hyman* (1972), 8 Ill. App. 3d 382, 290 N.E.2d 627.

## II

Defendant next contends that the State's failure to call Erskine Green as a witness deprived him of a fair trial. Defendant reasons that Green was a witness who had unique personal knowledge of the actual events which transpired the morning of June 26, 1975.

██ As a general rule, if a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and the witness' relationship with the State is such that he would ordinarily be expected to favor it, the State's failure to call that witness at trial *may* give rise to a permissible inference that the witness' testimony, if he had been called, would have been unfavorable to the State's case. McCormick on Evidence §272 (2d ed. 1972); 2 Wigmore on Evidence §§285-89 (3d ed. 1940); 29 Am. Jur. 2d *Evidence* §§180-87 (1967); see *United States v. Tucker* (7th Cir. 1977), 552 F.2d 202.

██ However, even if we were to assume, without deciding, that the State's failure to call Green as a witness, gave rise to such a permissible inference, this would not warrant the reversal of defendant's conviction. " '[I]t is fundamental that the [State] may accept the risk of negative inferences [arising] from the unexplained absence of a witness so long as the offense is otherwise proved.' " (*People v. Scott* (1967), 38 Ill. 2d 302, 306, 231 N.E.2d 441, 444, quoting *People v. McElroy* (1964), 30 Ill. 2d 286, 290, 196 N.E.2d 651, 653.) In this case, while Green was not called as a witness at trial, and despite the bizarre facts presented by both the prosecution and the defense, the State presented sufficient competent evidence to establish defendant's commission of the aggravated battery offense.

██ Il is true, as defendant points out, that Green was not *only* a witness to the events which transpired the morning of June 26, 1975, but was in fact the alleged victim of the armed robbery count in the indictment. We fail, however, to comprehend the significance of this fact, since the defendant was acquitted of the armed robbery charge. Defendant's conviction of aggravated battery was in connection with the shooting of Brooks. Brooks, unlike Green, was called as a witness at trial and was subject to defendant's cross-examination.

 Finally, we feel it necessary to point out that defendant has not indicated in his brief whether he attempted and was denied the opportunity to argue the permissible inference to the jury or to submit an appropriate jury instruction thereon. It is not this court's function to search the record on appeal for unargued and unbriefed reasons to reverse a criminal conviction. When a defendant seeks reversal, theories

not pursued nor advanced with citation of authorities are deemed waived. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644; *People v. Tiggs* (1976), 38 Ill. App. 3d 72, 347 N.E.2d 389.) In any event, even if we assume that defendant was precluded from presenting this inference to the jury, we find that upon the facts of this case it would have been, at most, harmless error. See *People v. Jablonskis* (1978), 64 Ill. App. 3d 559, 381 N.E.2d 774.

Accordingly, for the reasons stated, we affirm the conviction and sentence of the defendant.

Affirmed.

JOHNSON and ROMITI, JJ., concur.