*In re* JACQUES SANDERS, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* JACQUES SANDERS, Respondent-Appellant.)

First District (5th Division)    No. 78-1010

Opinion filed February 15, 1980.

James J. Doherty, Public Defender, of Chicago (Alan J. Cohen and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

A petition for adjudication of wardship was filed against the respondent, charging him with attempt armed robbery, murder and felony murder. Following an adjudicatory hearing, the trial judge entered a finding for the respondent on the attempt armed robbery and murder counts. There was a finding of delinquency on the felony murder count (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3)), and respondent was committed to the Department of Corrections. On appeal, he raises the following issues: (1) that the trial court erred in entering legally inconsistent findings, by entering a finding for respondent on the underlying felony of attempt armed robbery, while finding the respondent guilty of felony murder; (2) that the State failed to prove beyond a reasonable doubt that he was guilty of attempt armed robbery; (3) that the trial court abused its discretion by committing him to the Department of Corrections; and (4) that the State failed to prove the age of the minor.

The following pertinent facts were adduced at the adjudicatory hearing.

### For the State

#### Leona Mae Reynolds

She is the wife of the deceased. On February 22, 1976, between 7:30 and 8:30 p.m., she was at home with her husband and their daughter Nancy. While she and Nancy were in the living room watching television, Mr. Reynolds was in the kitchen. She heard a shot inside the house and then heard a door slam. She ran to the kitchen door and looked outside, but saw no one. As she turned, she saw Mr. Reynolds lying on his side between a chair and a table. Her husband did not respond when she called his name. She then returned to the living room and collapsed on the floor.

On cross-examination she stated that she saw no one with a gun when she heard the shot.

#### Nancy Reynolds

She is the 16-year-old daughter of the deceased. On the evening of February 22, 1976, she heard a shot from the kitchen, where her father was "closing up" his candy store. She immediately jumped up and called the police. She went next door to the neighbor's house until the police arrived.

On cross-examination she testified that she heard the shot, but did not see anyone with a gun.

#### Johnny Sanders

He is a 13-year-old boy who went to the Reynolds' candy store on the evening of February 22, 1976, with his brother, David, and his cousin,

Gary Washington, to buy candy. He entered the store and purchased a "Suzy Cue." He saw no one else in the store. As he walked out, he saw the respondent and Frank Lockett. He was a friend of the respondent and had known him for over four years.

He was the first one to leave Reynolds' store. As he was leaving, the respondent asked him who was in the kitchen. Johnny replied, "Mr. Reynolds." As he walked away, Gary joined him, while David was still in the store. As David walked out the door, he turned and saw the respondent, about five feet away from him, pull a nylon stocking over his face and walk toward Mr. Reynolds' door. As he ran to the corner, he heard Frank say, "Move," and then saw him push his brother down into the grass. When he reached the corner, about 40 feet from the Reynolds' door, he heard a shot. He did not see anyone with a gun. He, David and Gary then ran home.

When he arrived home at about 8:15 p.m., he received a phone call from the respondent. The respondent told him not to tell anybody what had happened, and in return for his silence, Frank agreed to give him some money. He declined the money, but agreed to remain silent because he was afraid.

The following day, the respondent talked to him again at the respondent's home. The respondent asked him if he knew that Mr. Reynolds was dead. He said he did, because his mother told him so. The respondent then told him that if he told the police what happened "They were going to put Frank away for a long time," because Frank was on probation. The respondent said he would probably "get out real early because he didn't shoot Mr. Reynolds." He then said, "All right" and went home.

On cross-examination, he said that no one else was in Mr. Reynolds' store besides Mr. Reynolds, himself, his brother and his cousin. He saw no one with a gun, and he never saw the respondent go into Mr. Reynolds' home.

*David Sanders*

He is the 10-year-old brother of Johnny Sanders. On February 22, 1976, at about 8 p.m., he was at the Reynolds' store with his brother, Johnny and his cousin, Gary. He also saw Mrs. Reynolds there that night. After buying some candy, he was the last of the three to leave. When he walked out, someone pushed him into the grass. He saw the respondent put on, "a stocking, a mask." Respondent then walked into the store with Frank.

After he saw this, he ran about 40 or 45 feet away, and he heard a loud noise coming from Mr. Reynolds' back door. He then ran home with his brother and his cousin.

On cross-examination, he said that the first person he saw upon

leaving Mr. Reynolds' store was Frank. Frank pushed him into the grass saying, "Move out of the way." The respondent, standing behind Frank, said nothing. He did not see Frank pull anything over his face, nor did he see any gun.

### Trallis Stanberry

She is in her second grade. She and her friend, Rickey Allen, were on their way to Mr. Reynolds' store at about 8 p.m., on February 22, 1976. As she approached the store, she noticed someone standing on the porch near Mr. Reynolds' back door. She then heard a shot. After pushing her friend out of the way, she saw someone else run out of Mr. Reynolds' house. The person who ran out pushed the person standing on the porch and told him to run. The person standing on the porch never entered the house. Both persons had masks over their faces, and one of them was carrying something.

Once outside Mr. Reynolds' home, the two individuals ran to a point about 10 to 15 feet away from her and removed their masks. She recognized one of them as the respondent, whom she had known from the neighborhood. She and her friend then ran home.

On cross-examination, she stated that she saw no one else around the Reynolds' home that night, and that she saw no other boys running from the house besides the two wearing the masks. It was dark, and she did not think it was possible for the minor to have seen her, although his view of her was unobstructed.

### Michael Robbins, Assistant State's Attorney

He investigated the death of Mr. Reynolds on the night of February 22, 1976. At about 1 a.m., he had a conversation with the respondent. The respondent told him that earlier that night, Frank Lockett came to his home and asked him to accompany him to the Reynolds' store. The respondent agreed, and they left together. En route, Frank told the respondent he had a gun, displayed it to him, and told him that he intended to rob Mr. Reynolds' store. The respondent stated that when they arrived, he decided not to go inside, or go through with the robbery. He never entered the store. Instead, he turned away and started walking home. Lockett went into Mr. Reynolds' home, and the respondent heard a gun shot. The respondent then ran home.

Later that evening, the respondent received a telephone call from Frank Lockett. Frank instructed the respondent to call the Sanders boys whom they saw in front of Mr. Reynolds' home, and to tell them they would be given money if they kept quiet. Respondent made this call.

In a second conversation with respondent, he admitted that he actually saw the gun, not that it was "flashed" to him as he first related.

*For the Respondent*
*Yvette Sanders*
She is the respondent's sister. She was at home on February 22, 1976, between 8:15 and 8:30 p.m. with her mother and the respondent. At that time, Frank Lockett arrived and joined the respondent in the living room. Frank and the respondent departed together. From the window of her home, she saw Johnny and David Sanders walking in a direction away from the Reynolds residence. While she was in the living room, she heard a loud noise. As she reached the window, she heard someone knock at the front door. She looked out the living room window, saw her brother, and let him in. Five seconds elapsed from the time she heard the noise until the knock at the door.

On April 13, 1976, she was outside the courtroom, awaiting one of the court proceedings on the present case. She heard Johnny and David Sanders discussing what they were going to say in court. David told Johnny that he was going to tell the truth. When David began to relate what he was going to say, Johnny said, "Man, don't say it like that. We are going to get in trouble. Don't say that."

Father William Falner, John Chubbs and Thomas L. McMahon were called as character witnesses for respondent. Each testified that the respondent had no reputation for violence, nor did they hear anyone talk about the respondent having any violent traits.

There were several witnesses who appeared at the dispositional hearing in this case. Their testimony is not relevant to the resolution of this appeal.

OPINION

Respondent contends that the trial judge erred in entering legally inconsistent findings, by finding for the respondent on the attempt armed robbery count while finding against respondent on the felony murder count that arose out of the same occurrence.

■■ ■ The State's response initially is that respondent failed to raise the alleged inconsistency of verdicts in his motion to vacate, and as a result has waived this issue for review. The general rule is that failure to allege errors specifically in a motion for a new trial constitutes a waiver of those issues. (*People v. Donnenfeld* (1978), 62 Ill. App. 3d 991, 379 N.E.2d 710.) Although a motion to vacate in a juvenile proceeding is analogous to a motion for a new trial in a criminal proceeding, we conclude that the issue is reviewable under the plain-error rule. (Ill. Rev. Stat. 1977, ch. 110A, par. 615.) Under this rule, a reviewing court may take notice of plain error on defects affecting substantial rights of a defendant. (*People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) Courts are especially

willing to intervene on their own motion and take note of substantial errors in proceedings involving minors. *In re Interest of Carson* (1973), 10 Ill. App. 3d 387, 294 N.E.2d 75.

Generally, neither legal nor logical consistency of verdicts is required. (*People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, *cert. denied* (1975), 423 U.S. 835, 46 L. Ed. 2d 54, 96 S. Ct. 51; *People v. Jayne* (1975), 52 Ill. App. 3d 990, 368 N.E.2d 422.) The reasons for allowing inconsistencies in verdicts are based upon the advantages of leaving a jury free to exercise its historic power of lenity. (*People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.) Jurors sometimes acquit defendants on one or more counts of a multicount indictment, while simultaneously entering an inconsistent verdict of guilty on another count, because of a belief that sufficient punishment is provided by convicting on the other counts. *People v. Ellis* (1976), 39 Ill. App. 3d 766, 350 N.E.2d 265.

■■■ The present appeal does not involve the exercise of discretion by a jury, but the findings of a trial judge after an adjudicatory hearing. In this situation, reviewing courts more readily find the vagaries of a judge to be reversible error. (*People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539.) In the instant case, respondent was charged with the following offenses: attempt armed robbery (count I), murder (count II), and felony murder (count III). After the adjudicatory hearing, the trial judge stated:

"Count I and II, there will be a finding for the minor respondent with the petition dismissed, proceedings closed."

There was a finding of delinquency as to the remaining felony murder count (count III).

The findings made by the judge are legally inconsistent. A legally inconsistent verdict may be described as follows:

"Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element * * * [is] found both to exist and not to exist." (*People v. Murray* (1975), 34 Ill. App. 3d 521, 532, 340 N.E.2d 186, 194.)

The trial judge's findings in the hearing below indicate that he found the same elements of the crimes charged against respondent to both exist and not exist. The statutory elements of felony murder, of which respondent was found delinquent, consist of the following:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

* * *

(3) He is *attempting* or committing a *forcible felony* other than voluntary manslaughter." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).)

Because the trial judge found respondent delinquent as to the felony

murder count, he necessarily found both of these elements to exist. In contradiction, however, the trial judge entered a finding for respondent as to the underlying count of attempt armed robbery. (Ill. Rev. Stat. 1975, ch. 38, par. 8—4.) Since the court implicitly found the elements of attempt armed robbery to exist, as evidenced by the finding against respondent as to the felony murder count, while simultaneously finding for respondent on the attempt armed robbery count, it found the same elements to exist and not exist. These findings are legally inconsistent, and the finding as to felony murder as a matter of law cannot have been based upon proof beyond a reasonable doubt. *People v. Murray* (1975), 34 Ill. App. 3d 521, 340 N.E.2d 186.

A similar situation confronted this court in *People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539. In that case, the trial judge entered findings of not guilty of armed violence and guilty of aggravated assault against defendant, which arose out of an alleged firing of a hand gun at police officers. The facts in that case were such that the judge had to conclude that defendant was armed with a dangerous weapon to sustain the conviction of aggravated assault. (Ill. Rev. Stat. 1971, ch. 38, par. 12—1.) Yet, the trial judge apparently reached the opposite conclusion when he acquitted defendant of armed violence, since the elements of that crime also require one to perform, "any act prohibited by [section 12—2 (aggravated assault)]," "while armed with a dangerous weapon." (Ill. Rev. Stat. 1971, ch. 38, par. 33A—2.) The court stated:

> "Because of the facts in this case, then, the elements of aggravated assault and armed violence are identical, and the proof that would suffice to convict for one offense, being precisely the same, would equally support conviction of the other. The findings of not guilty of armed violence and guilty of aggravated assault are therefore 'legally inconsistent,' and the convictions may not stand." *Pearson*, 16 Ill. App. 3d 543, 548, 306 N.E.2d 539, 543.

We are not persuaded by the State's argument that the doctrine articulated in *People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, which dispenses with the requirement of legally consistent verdicts, should be applied to bench trials. In *Dawson*, defendants were charged with murder, felony murder, and armed robbery arising out of the shooting death of a service station attendant. While the defendant who actually shot the victim pleaded guilty to the crime of murder, the other defendant, who was prosecuted under an accountability theory, pleaded not guilty. After a jury trial, the latter was found guilty of armed robbery, but not guilty of murder. The jury's inconsistent verdicts were sufficiently explained by the defective instructions, and the incomplete verdict forms that were given to them. The court also found that the verdicts were attributed to the exercise of lenity by the jury.

That case is readily distinguishable from the present situation, in

which the trial judge, sitting alone, faced no such problems. Moreover, the trial judge's findings in the instant case cannot even be justified under the relaxed standard for evaluating jury verdicts as set forth in *Dawson*. Justice Smith, in his dissenting opinion in *People v. Dawson* (1974), 19 Ill. App. 3d 150, 310 N.E.2d 800, *rev'd* (1975), 60 Ill. 2d 278, 326 N.E.2d 755, aptly stated the problem of reaching inconsistent verdicts, in a factual situation very similar to the one before this court:

> "If the jury in this case had found the defendant not guilty of armed robbery and guilty on the felony murder count, a conviction on that count could not stand for the very simple reason that a felony murder conviction cannot be sustained if no felony was committed. In such instance, you have truly legally inconsistent verdicts." (*Dawson* (1974), 19 Ill. App. 3d 150, 160, 310 N.E.2d 800, 807, *rev'd* (1975), 60 Ill. 2d 278, 326 N.E.2d 755.)

Accordingly, the legally inconsistent findings entered by the trial judge in this case require us to reverse respondent's conviction.

No evidence was adduced at the adjudicatory hearing that indicated that the respondent himself killed the deceased. The disputed issue of fact as to the charges against the respondent was whether his actions constituted the crime of attempt armed robbery under a theory of accountability. This factual determination forms the foundation for respondent's adjudication of delinquency for felony murder. The trial judge's finding in the respondent's favor for the offense of attempt armed robbery reflects that the State failed to prove beyond a reasonable doubt that he did commit this crime. A new hearing on the felony murder charge would again raise this issue of fact, and would run afoul of the 1970 Illinois Constitution which provides that there shall be no appeal from a judgment of acquittal after a trial on the merits in a criminal case. (Ill. Const. 1970, art. VI, §6; *People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539.) A rehearing on the felony murder charge would also violate principles of collateral estoppel as embodied in the Fifth Amendment to the United States Constitution. *Ashe v. Swenson* (1970), 397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189.

Because of our disposition of this appeal on the first issue, there is no need to discuss the other issues raised by respondent. Since the findings are legally inconsistent, and a new hearing on the charge of felony murder is barred on double jeopardy grounds, the findings of delinquency based thereon must be reversed.

Reversed.

MEJDA and WILSON, JJ., concur.