*In re* MALE CHILD RITCHIE.—(MICKY JOE MORFEY, Petitioner-Appellee and Cross-Appellant, *v.* NANCY RITCHIE, Respondent-Appellant and Cross-Appellee.)

Second District   No. 77-335

Opinion filed April 11, 1978.

1046

John A. Leemon, of Mt. Carroll, for appellant.

Edward M. Maher, of Roszkowski, Paddock, McGreevy & Johnson, of Rockford, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Micky Joe Morfey, the putative[1] father of male child Ritchie filed a petition under the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, pars.

---

[1] The petitioner stated that he is the natural father of the child. Paternity has not been made an issue in the proceedings, although it has not been established in a paternity action.

702—1, 702—4). He alleged that he fathered the child, that the child was neglected, dependent and otherwise in need of supervision. He alleged that the child had been abandoned by his natural mother, Nancy Ritchie, the respondent. He sought the appointment of a guardian with power to consent to the adoption of the child by the petitioner and asked that he be granted custody. Following a hearing the court entered an adjudicatory order which found that the child was "neglected as to other care necessary for his well-being" and set a date for a dispositional hearing. Following the dispositional hearing the trial court entered judgment awarding the custody of the child to respondent Nancy Ritchie, granting visitation rights to the father, ordering the father to pay certain medical and hospital expenses and to pay weekly child support. The mother appeals. The father cross-appeals from the portion of the order which granted custody of the child to the mother.[2]

The petitioner and the respondent were both long-standing residents of Savanna, Illinois, who dated from early 1973 until January of 1976. There had been serious discussions with respect to marriage but in January of 1976 the respondent determined that she did not wish to marry petitioner and broke off the relationship. In March she discovered that she was pregnant. There were apparently later discussions between the parties which did not end in common agreement. In May 1976 respondent left Savanna for Winona, Minnesota, for the purpose of having her child. She chose Winona because she had an aunt and uncle there and because of the location there of Catholic Charities, a social service organization, which assists unmarried mothers. She intended to return to Illinois after the child was born.

The father wrote to her stating that if she sought to have the baby adopted he wanted to be recognized as the father "or I will go for full custody of the baby with or without you." In later letters petitioner urged that the child not remain in foster care status and said he wanted the child to live with one or the two of them. He indicated that he was still in love with respondent and desired to marry her. However, respondent advised the Catholic Charities that there was no possibility of marriage and that she believed the child would have a better opportunity if reared by two parents with an established home. She did not feel that financially or psychologically she was prepared to be a single parent. She felt that the father wanted the baby to remain with one of them so that their relationship with each other could be resumed.

The child was born on October 11, 1976, and respondent immediately returned to Savanna leaving the child in Winona with the Catholic Charities in foster care status.

Some time in October petitioner began living with Ruth Commisio,

---

[2] In the trial court the case before us was tried together with the father's petition to adopt the child, which was denied. There is no appeal from that judgment.

whom he later married, and her three-year-old daughter. Yet there is also some evidence that the petitioner still hoped that respondent would marry him as late as November 1976. Also in November, petitioner sent Catholic Charities a check which was returned with a letter advising petitioner that if he wished to pay any of the baby's bills he should contact respondent or her attorney. The record shows that all payments for the baby's maintenance and for maternity bills were paid by respondent.

Commencing in December of 1976, or possibly some time earlier, petitioner began to visit the child at the Catholic Charities in Winona and brought toys and clothes.

He filed his petition in March of 1977 and personal service of summons was made on the respondent in Savanna. Thereafter her attorney filed a motion to dismiss the petition for failure of jurisdiction alleging that the child had never been in the State of Illinois. The motion was denied and an evidentiary hearing set on the petition for April 27, 1977.

At the evidentiary hearing respondent stated "at this time" she did not have any intention of ever raising the child but wished to place the child for adoption if the petitioner consented. She said, however, "I will keep him if I have to * * * instead of letting the father have him." She stated that the child was six months old and that she had never had him in her custody nor had she named the child. She said that Catholic Charities would release the child into her custody at any time but that she had no plans to have the child returned. Also, it appeared from her testimony that she was living at home with her parents, working 40 hours a week and making $2.40 an hour. She agreed that it would be possible for her to keep the child with her if she also received support payments.

Petitioner testified that he desired custody because the child "should be with one of its natural parents." At this time petitioner was living with and supporting Ruth Commisio and her little girl. He stated that he and Ruth had plans to be married; that he was a full-time employee of a railroad and had earned $11,300 the previous year.

Petitioner's mother and sister-in-law were called as witnesses and both testified that they were available to assist in caring for the child should petitioner be granted custody.

The court took the case under advisement. Thereafter, on May 14, 1977, respondent brought the child to Savanna. Respondent's caseworker with Catholic Charities stated in her report that she was not sure what motivated the abrupt decision. Also, about this time the trial court received a request from petitioner's counsel that petitioner be given temporary visitation which the court referred to the probation officer.

The trial court announced its decision on May 24, 1977, finding that the child was "neglected" as "to other care necessary for his well-being." The court stated that it based its finding on the fact that the child's life was in a

state of "limbo" and expressed the concern that the longer the child remained in this status the more difficult it would be for him to establish a permanent family environment. At the dispositional hearing it appeared that the parties' circumstances had changed substantially since the earlier hearing. Respondent now had the child with her and had named him Jason Wayne Ritchie. She now indicated that "under no circumstances would she give the child up for adoption." She was engaged to be married and her fiance testified that he had grown to love the child and wished to join in his adoption after they were married. There was further testimony that respondent had been tending to all motherly duties and was very good with the baby, who knew respondent was his mother. Petitioner's status had also changed. He was now married, he had improved earnings and improved living facilities for another child. His wife also testified to her attachment for the child. The adjudicatory order from which the appeal was taken followed.

In respondent's appeal she first questions the right of the Circuit Court of Carroll County to hear and decide the case and, alternatively, its procedures. However, we conclude that none of these challenges is meritorious.

■■ The respondent initially argues that the court lacked jurisdiction because, when the petition was filed, the child was not physically present in Illinois. It was sufficient that both the petitioner and the respondent were personally subject to the jurisdiction of Illinois. (See *Faris v. Faris*, 35 Ill. 2d 305, 309 (1966).) The rule has also been stated.

> "A state has power to exercise judicial jurisdiction to determine custody or appoint a guardian of the person of a child or adult * * * who is neither domiciled nor present in the state, if the controversy is between two or more persons who are personally subject to the jurisdiction of the state." Restatement (Second) of Conflicts of Laws, §79(c) (1971).

■■ In addition, the respondent had the sole authority to retrieve the child from Catholic Charities in Minnesota, and, in fact, did so in the middle of the proceedings. Consequently, she should not be heard to complain that the child was absent from the State when it was completely within her power to cure any possible error and when she, in fact, did bring him back into the State and further participated in the proceedings with the child continuing to remain in Illinois. (*Cf. Donlon v. Miller*, 42 Ill. App. 3d 64, 71 (1976).) We cannot agree that *In re Gonzales*, 25 Ill. App. 3d 136, 143 (1975), cited by the respondent, states a different rule.

■■ Respondent then argues that even assuming the court had jurisdiction it erred in refusing to apply Minnesota law rather than Illinois law. If any reason existed to apply Minnesota law, and we think none existed (see *Ingersoll v. Klein*, 46 Ill. 2d 42, 48 (1970)), it would have

disappeared when Catholic Charities of Winona, Minnesota, released the child into the actual custody of respondent who then brought him to Illinois.

The mother also argues, on the assumption that the court erred in concluding in the adjudicatory hearing that the child was a neglected minor within the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 702—4(1)(a)), that the proceedings could not properly be brought to a conclusion under that Act.

■■ We do not agree with the assumption. The court could properly find in the adjudicatory hearing that the child was then "neglected" as to "other remedial care necessary for his well-being" as phrased in the statute. Immediately after birth the child had been placed in foster care status with Catholic Charities in another State while the mother returned to Illinois. The mother, who raises the issue here, was not then visiting the child, had no plans at that time to raise him or make him part of her family and desired that he be adopted by someone other than his natural parents. And because of the opposition of the natural father to adoption by others, the child could not then be part of any family. Thus, in spite of the fact that the court found that the mother had been supporting the child, had not abandoned him and was not unfit, it could still properly conclude based upon the evidence that the child was neglected as to the care necessary for his well-being which dictated that the child be made a ward of the court for his protection and in consideration of his best interests.

■■■ We agree with respondent's argument that the Juvenile Court Act does not expressly provide a vehicle for determining custody of an illegitimate child absent a showing that the child is neglected as that term is used within the statute (*People ex rel. Elmore v. Elmore*, 46 Ill. App. 3d 504, 506 (1977)). However, we do not agree, even if we assume that the court erred in its finding of neglect, that the trial court was without authority to decide this case. As noted in *Elmore*,

> "In the absence of legislation establishing a procedure for resolving a dispute over custody of a child between parents who never have been married, society requires that the law shape an appropriate forum." (46 Ill. App. 3d 504, 506.)

The form of a request for habeas corpus relief has been deemed suitable for adjudicating disputes between parents over custody and visitation of an illegitimate child on the basis of the child's best interests. (See *People ex rel. Irby v. Dubois*, 41 Ill. App. 3d 609 (1976); *People ex rel. Elmore v. Elmore*, 46 Ill. App. 3d 504 (1977); *cf. People ex rel. Slawek v. Covenant Children's Home*, 52 Ill. 2d 20 (1972); Annot., 45 A.L.R. 3d 216, 221 (1972).) Here the petition although purported to be brought under the

Juvenile Court Act would appear to meet the requirements of a petition for habeas corpus (see Ill. Rev. Stat. 1973, ch. 65, par. 3). Courts may disregard labels, and may grant relief to which a plaintiff is entitled upon the evidence. (See Ill. Rev. Stat. 1975, ch. 110, par. 34; *cf.* Ill. Rev. Stat. 1973, ch. 65, par. 36.1; *People ex rel. Haven v. Macieiski,* 38 Ill. 2d 396, 398 (1967).) Even without proof of neglect as defined in the Juvenile Court Act, the court could in the interest of protecting the welfare of the child provide a forum as if under the habeas corpus act and reach the same ultimate conclusion. We also consider it unseemly that the respondent having participated in the entire proceedings now complains that the proceedings should have been brought in another form, particularly in the absence of any showing that the child's best interests have in any way been prejudiced.

We then reach the substantive arguments which respondent makes on appeal. She argues that the trial judge erred when he granted visitation privileges to the petitioner. Essentially she reargues the procedural contentions which we have disposed of. She offers no substantial argument that petitioner has conducted himself in a manner which would make visitation rights against the child's best interests. At best she argues that there is no mandate that the father of an illegitimate child is to be granted rights of visitation. She is arguing, in substance, that she has the natural right to the custody of the child and that the court should not interfere. She contends that the court should have dismissed the proceedings since under the circumstances it clearly appeared that it was not in the best interests of the child that the putative father have either custody or visitation rights.

We will therefore consider the question of visitation together with the issues raised on the cross-appeal by the father who contends that he should have been granted custody of the child.

This area of the law has undergone much change in recent years. (See *People ex rel. Slawek v. Covenant Children's Home,* 52 Ill. 2d 20, 22 (1972); *People ex rel. Irby v. Dubois,* 41 Ill. App. 3d 609, 612 (1976); *In re Jones,* 34 Ill. App. 3d 603, 606-07 (1975). See also Annots., 45 A.L.R.3d 216 (1972), 15 A.L.R. 3d 887 (1967), 70 A.L.R. 3d 262 (1976).) No presumption exists favoring custody in either parent. (*People ex rel. Irby v. Dubois,* 41 Ill. App. 3d 609, 612 (1976); *People ex rel. Elmore v. Elmore,* 46 Ill. App. 3d 504, 506 (1977).) Each case, however, must be decided on the basis of the unique problems of the child whose best interests remain the primary consideration. (*People ex rel. Vallera v. Rivera,* 39 Ill. App. 3d 775, 777 (1976).) As a general rule in the determination of custody the trial judge is accorded broad discretion and his findings will not be disturbed unless a manifest injustice is shown. (41 Ill. App. 3d 609, 614.) The right of

reasonable visitation of an illegitimate child by a putative father similarly is to be decided in the particular circumstances based on the best interests of the child. *People ex rel. Vallera v. Rivera,* at 777-78; Annot., 15 A.L.R. 3d 887 (1967).

■■ Upon application of these principles to the circumstances of this case, we conclude that the trial court did not err in awarding custody of the child to his mother nor in granting the father reasonable visitation.

On the issue of custody the petitioner has argued in his cross-appeal that the fact that the mother showed no maternal interest until the child was almost seven months old and did not, in fact, visit the child in Minnesota until the child was in his fifth month militates against her right to custody. He contrasts this with the interest which he continually showed in the child's well-being from birth and notes that even at the dispositional hearing the evidence showed that he could give the child a more stable home environment than the natural mother. The mother, however, argues that she had paid all of the doctor and hospital bills and provided the sole support for the child, and that the petitioner had not offered to repay her. She notes that the probation officer's report determined that at all times the child was in her custody, she cared for the child and demonstrated an ability to plan for his present and future needs; while the report suggested that petitioner had shown a certain immaturity in approaching the problem with the view that respondent would ultimately marry him.

When the proceedings are viewed as a whole we find nothing in the record which requires a conclusion that the mother did not at all times have the child's best interests in mind, both initially when she concluded that adoption by other than a natural parent would be best under all of the circumstances, and later when she decided to raise the child in her custody. She may have been mistaken in her early view that she alone could control the destiny of the child. She also may have been mistaken in her view that adoption by others before she should establish a family relationship with the child was the best solution. However, there is no indication in the record that she at any time was abdicating her responsibility or was not considering the best interests of the child. In any event the trial judge was in the best position to determine this question within the exercise of his considerable discretion in custody matters and we will not interfere with that judgment.

■■ The same considerations impel the conclusion that reasonable visitation was properly granted to the father. This is not to say, of course, that if in the future the circumstances change and it should appear that the best interests of the child are not being served by the judgment which was entered, the trial court on proper application may make such other and

further orders in the child's best interests as may be then appropriate. We affirm the judgment.

Affirmed.

BOYLE and NASH, JJ., concur.