*In re* DANNY WHITE *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MARY WHITE *et al.*, Respondents-Appellants.)—*In re* PAUL WHITE, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MARY WHITE *et al.*, Respondents-Appellants.)

Fourth District   Nos. 16954, 16956, 17016 cons.

Opinion filed January 6, 1982.—Rehearing denied January 28, 1982.

Gerald G. Kaluzny, of Prairie State Legal Services, Inc., and Robert G. Deneen, both of Bloomington, for appellants.

Ronald C. Dozier, State's Attorney, and Alan L. Sternberg, of Pratt, Larkin, Sternberg & Finegan, P. C., both of Bloomington (Robert J. Biderman and James K. Horstman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Eitan Weltman, of Bloomington, and Gary G. Johnson, of Normal, guardians ad litem.

JUSTICE MILLS delivered the opinion of the court:

There are 13 children in the White family and 5 of them are retarded.

We deal here with three of those children: Danny, George, and Paul—all severely and profoundly mentally retarded.

They were found to be neglected minors as to their education, were made wards of the court, had their custody placed with the Illinois

Department of Mental Health and were placed in private licensed facilities.

We affirm.

## Procedural History

In 1978, Danny and George White were found to be neglected minors as to their education and were made wards of the court pursuant to the Juvenile Court Act. (Ill. Rev. Stat. 1979, ch. 37, par. 701—1 *et seq.*) They were left in the custody and guardianship of their parents, but the court directed that they attend special education programs of School District No. 87. On August 1, 1980, the State filed a supplemental petition alleging that Danny and George had "periodically" attended District 87's program at MARC Center in Bloomington and that that facility would not accept them for the 1980-81 school year because of lack of support and cooperation from the White family and because of the boys' extremely poor attendance in the past.

On August 20, 1980, the court filed an order—"approved" by all parties concerned—which provided that the minors would not be required to attend any special education program "at this time," nor would their mother be required to cooperate with such a program "at this time." Further, District 87 would not be required to provide a program for the minors "at this time." The order also stated that the parties were to report to the court immediately upon the termination of certain administrative proceedings that Mrs. White had brought before the United States Department of Education.

On September 23, the State filed another supplemental petition alleging that, pursuant to the August 20 order, Danny and George had not been attending any special education programs but that it was necessary, because of their disabilities and regressive development, that they be in a program. The petition sought dispositional hearings as to Danny and George. In addition, on this date a petition for adjudication of wardship was filed as to Paul White, alleging that he was a neglected minor as to his education. On November 20, an order was entered stating that the September 23d supplemental petition had been proven, and adjudging George a neglected minor and making him a ward of the court. An order was also entered adjudging Paul a neglected minor and making him a ward of the court.

Following dispositional hearings, the court transferred custody of Danny and George to the Department of Mental Health and directed that they be placed at Shroyer House and New Hope Living and Learning Center, respectively (general No. 16954). An order was also entered placing custody of Paul with the Department and directing placement at Chileda (general No. 16956). On February 18, 1981, the State filed a

supplemental petition alleging that New Hope had refused to accept George and asking that he be placed at Woodhaven Home. Following a further dispositional hearing, the court entered an order giving the Department authority to place George at New Hope, Woodhaven, or the Institute of Logopedics (general No. 17016).

## Summary of Testimony

At the hearing held on the September 23, 1980, supplemental petition, witnesses for respondent-parents testified that schooling would not be beneficial to the White boys and that Mrs. White could do a better job of training them. Witnesses for the State testified that during the 1979-80 school year, when the White youngsters were assigned to special education programs at District 87, their attendance was very sporadic. Attendance records indicated that Danny and George had been absent 57% and 58% of the time, respectively, during that year. (Records for 1971 to 1979 indicated only two years when their attendance was any better and showed four years for each of the boys when they were absent 100% of the time.) They were often gone from school for days on end and did not return to school at all following the Easter vacation.

A number of school officials testifying for the State described in detail Mrs. White's refusal to cooperate with programs the district had planned for the boys. She was never satisfied with anything that the district would try to do, and she claimed that their attendance at school was upsetting them. These officials further testified that during the short time that they were attending regularly, the boys showed a noticeable improvement in their ability to perform basic skills. Witnesses described all three boys as severely and profoundly mentally handicapped. Danny and George, in their mid-teens, were unable to speak at all. Paul, age seven, still wore diapers.

## Opinion

I. In all three of these consolidated appeals, respondents have contended that the trial judge exceeded his authority under the Juvenile Court Act in ordering the boys placed at specific privately operated facilities. As authority they cite *In re Peak* (1978), 59 Ill. App. 3d 548, 376 N.E.2d 862, wherein the trial court had ordered a neglected minor to be placed in a private facility and ordered the Department of Mental Health to pay for that care. The appellate court reversed, stating that the trial court had exceeded its statutory authority, for no provision of the Juvenile Court Act authorized placing a neglected minor in a private psychological hospital or requiring the Department to pay for his care in such a facility. We, however, are not inclined to follow the *Peak* case. First, it must

be noted that the *Department* was the appellant in that case. Here, officials from the Department in fact recommended the placement which the trial court directed. Second, unlike the White youngsters, the minor in *Peak* was not in the custody of the Department. Third, and most importantly, we disagree with the conclusion in *Peak* that the Juvenile Court Act does not authorize directing placement of a minor in a specific private facility. Section 5—7(1)(c) of the Act (Ill. Rev. Stat. 1979, ch. 37, par. 705—7(1)(c)) allows a court to commit its ward "to an agency for care or placement, except an institution under the authority of the Department of Corrections or of the Department of Children and Family Services." It is clear that the facilities in question here were not under the authority of DOC or DCFS. Thus, if each is "an agency for care or placement," then the court was proper in directing such placement.

Section 1—6 of the Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—6) defines an "agency" as "a public or private child care facility legally authorized or licensed by this State for placement or institutional care or for both placement and institutional care." The record contains testimony that each facility has been approved by the Department of Mental Health for placement and for funding of that placement. Thus, it is clear that each facility comes within the definition of "agency," and the trial court was authorized to direct placement at those facilities.

■■ (In their reply brief, respondents argue that the court erred in giving custody to the Department of Mental Health, for the Act authorizes commitment only to an "agency," and the Department is not an agency. This contention, however, has been made only in their reply brief, and the issue has therefore been waived. 73 Ill. 2d R. 341(e)(7); *Donaldson v. Board of Education* (1981), 98 Ill. App. 3d 438, 424 N.E.2d 737.)

II. Respondents also contend that the trial court abused its discretion in ordering Danny and George placed in residential schools for periods of time that will follow their 16th birthdays. They argue that section 26—1 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 26—1) requires attendance only up to a minor's 16th birthday and that the court therefore could not require residential school attendance thereafter.

■■ We see the passing of the minors' 16th birthdays as having no bearing whatever upon the propriety of the trial court's dispositional order concerning Danny and George. They were wards of the court, and as such it was the court's responsibility to make a disposition which would be consistent with their best interests. There was substantial evidence of their intellectual and emotional handicaps, and there clearly was no abuse of discretion in the trial court's decision that a long-term program of care and education would best serve their needs. Section 26—1 merely has the effect of requiring a minor's custodian to send the child to school while he

is of a certain age. It cannot be construed as a straitjacket that would preclude a court in a juvenile proceeding from making an appropriate dispositional order.

(Respondents also contend that the trial court erred in adjudging Danny a neglected minor as to his education, based upon evidence of his not attending school following his 16th birthday, which occurred November 19, 1979. This argument is wholly without merit, for Danny was adjudged a neglected minor in 1978.)

III. Respondents next argue that the November 20 order, which adjudged George a neglected minor and made him a ward of the court and which found that it was in Danny's best interests to remain a ward of the court, was inconsistent with the August 20 order, which stated that it was not in the minors' best interests to attend a special education program "at this time." The inconsistency between these orders, say respondents, requires the latter order to be reversed. *In re Sanders* (1980), 81 Ill. App. 3d 843, 401 N.E.2d 1118.

■■ Again, respondents are overlooking the fact that George was actually adjudged a neglected minor and made a ward of the court in 1978. The trial court apparently overlooked the 1978 order when framing its order of November 20. Since George was already a ward of the court, the November 20 order was superfluous and cannot be a ground for error. Although the judge referred to the hearing on the September 23 supplemental petition as "adjudicatory," the supplemental petition requested a *dispositional* hearing. Because adjudications of neglect and wardship had already been made, and because the State asked for a dispositional hearing, we deem it proper to view this as a dispositional hearing and ignore the superfluous adjudicatory order of November 20.

IV. At the hearing on the September 23 supplemental petition (held November 18 and 19), respondents made a continuing objection to the admission of evidence concerning matters occurring before August 20, when the court had entered the consent decree excusing respondents from sending the boys to special education programs. Respondents argue that the August 20 order was *res judicata* as to facts that existed at that time and that only evidence of Danny's and George's regression following that date was admissible. (In fact, there was virtually no evidence concerning their condition between August 20 and November 19, 1980. Rather, the evidence almost entirely concerned the 1979-80 school year.)

For a number of reasons, we disagree.

■■ *First*, the authorities are conflicting as to whether a consent decree has the same *res judicata* effect as an order entered after a matter has been fully contested. (Compare *Green v. Hutsonville Township High School District No. 201* (1934), 356 Ill. 216, 190 N.E. 267; *People ex rel. Oliver v. Knopf* (1902), 198 Ill. 340, 64 N.E. 842; *Wadhams v. Gay* (1874), 73 Ill. 415;

*People ex rel. Nelson v. Joliet Trust & Savings Bank* (1942), 315 Ill. App. 11, 42 N.E.2d 90, with *First National Bank v. Whitlock* (1945), 327 Ill. App. 127, 63 N.E.2d 659; *Merriam v. Merriam* (1917), 207 Ill. App. 474.) *Second*, the August 20 order makes it abundantly clear that it was entered simply in order to stay these proceedings until respondents' administrative complaint with the United States Department of Education had been ruled upon. It was clearly not intended as a finding that the minors did not require schooling. *Third*, section 5—1(1) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 705—1(1)) allows the judge at a dispositional hearing to admit into evidence "[a]ll evidence helpful in determining [the] question [of disposition]." Although this provision was not necessarily enacted to supersede the rules of *res judicata*, it shows a clear intention that juvenile courts have wide latitude in admitting evidence at dispositional hearings. *Fourth*, much of the evidence at the November 18 and 19 hearing concerned the fact that people with mental capacity of the White minors regress when they are not participating in a structured educational program. This general testimony was certainly relevant to the minors' continuing circumstances and to the allegation in the September 23 supplemental petition that they were regressing because of failure to attend school.

Considering all these factors, we conclude that the court did not err in admitting evidence which predated the August 20, 1980, order.

V. Respondents also contend that the trial court's conclusion that the three minors' best interests would be served by placement in residential facilities was against the manifest weight of the evidence. This argument is wholly without merit. The record indicates that when special education programs have been established for the White boys (at least one of which involved hiring a full time teacher to work only with Danny), the programs have been unsuccessful because of Mrs. White's refusal to cooperate. At one time, a home tutorial program was set up, but it lasted for only two weeks because Mrs. White thereafter refused to allow it to continue. Numerous witnesses advised the court that placement at home would be inappropriate because of Mrs. White's refusal to cooperate in having the boys educated. There was testimony that placement in a community facility providing one-on-one attention would be appropriate. But the only such facility in the community—MARC Center—had already refused to take Danny and George because of their failure to attend in the past.

A DCFS caseworker did recommend leaving the minors at home. However, he conceded that he was not an expert in the area of developmentally disabled youngsters and stated that he had very little background in working with severely and profoundly mentally retarded children. Respondents produced an expert who testified that she would

recommend removing mentally handicapped minors from their homes only if there is clear evidence of continual neglect and abuse at home. This witness, however, was almost totally unfamiliar with the White boys themselves, and the trial judge was justified in giving little weight to her testimony.

All this, coupled with the testimony that the boys actually were progressing during the short time they regularly attended special education programs, provides abundant support for the trial court's decision. The court obviously did not abuse its discretion. *In re Ritchie* (1978), 58 Ill. App. 3d 1045, 374 N.E.2d 1292.

■■ VI. In the course of the dispositional hearings, respondents' expert, Sharon Freagon, sought to show certain slides of various mentally handicapped youngsters in a facility in Kentucky. The court correctly denied admission of the slides because of lack of foundation. Freagon's testimony indicated that she had very little knowledge concerning the specific abilities, handicaps, and conditions of the White youngsters. She was therefore unable to testify that the children in the slides were similar in age and intelligence to the White children. In addition, there was no testimony to the effect that the institutions depicted in the slides were similar to any potential placement facilities in this case. Under these circumstances, the court did not abuse its discretion in deciding that the photographs would not be helpful in deciding the question of disposition. See Ill. Rev. Stat. 1979, ch. 37, par. 705—1(1).

VII. Respondents further argue that a fatal variance exists between the petition for adjudication of wardship as to Paul and the order stating that the petition had been proven and that it was in Paul's and the public's best interests that he be adjudged a neglected minor and made a ward of the court. In particular, the petition alleged that Paul had failed to attend MARC Center, but the evidence indicated that Paul was assigned to Raymond School.

■■ Only material variances between allegations and proof are fatal, and a variance is material only if it surprises or prejudices the other party. (*Stevenson v. Meyer* (1957), 10 Ill. 2d 335, 139 N.E.2d 740.) Respondents do not argue that they were either surprised or prejudiced by this variance, and we can conceive of no way in which they might have been. Early in the hearing, Paul's school attendance records were admitted, indicating that he had never been assigned to any school other than Raymond. Respondents were obviously aware of the school Paul was assigned to attend. The thrust of the petition is that Paul had not attended school; the mistaken designation of the specific facility was of no consequence.

VIII. On February 24, a further dispositional hearing was held on the State's February 18 supplemental petition, which alleged that the facility

in which the Department of Mental Health had been directed to place George had refused him admission. That petition asked that the Department be given authority to place George at Woodhaven Home. The court in fact authorized placement at Woodhaven, New Hope Living and Learning Center, or Institute of Logopedics. Respondents contend that the evidence at the February 24 hearing was insufficient to allow the trial court to find that it was in George's best interests to be placed at any of these facilities. They point out that the State produced testimony only as to Woodhaven and that the one witness who testified concerning that facility had never visited it, had no personal knowledge of it, and was unable to answer a number of questions about it on cross-examination.

■■ Respondents err in thinking that the testimony produced at the February 24 hearing was the only evidence upon which the court could base its dispositional order. Section 5—1(1) of the Act (Ill. Rev. Stat. 1979, ch. 37, par. 705—1(1)) allows the court to use any "helpful" evidence in determining disposition. Under that provision, it was proper for the court to consider evidence produced at prior dispositional hearings in this case. (*In re Brown* (1978), 71 Ill. 2d 151, 374 N.E.2d 209.) That evidence indicated that each of these facilities has been approved by the Department of Mental Health for placement of mentally retarded Illinois residents. Thus, the trial court had sufficient evidence to find that it was in George's best interests to authorize the Department to place him at Woodhaven, Institute of Logopedics, or New Hope.

IX. Respondents next charge that all the dispositional orders were improper because the State failed to show that placement in residential facilities was the least restrictive alternative for meeting the minors' needs. In this regard, they cite *Chicago Board of Education v. Terrile* (1977), 47 Ill. App. 3d 75, 361 N.E.2d 778, wherein a minor successfully appealed from a trial court order committing her to a parental school. The appellate court held that she had been denied due process of law by being committed to the school without an affirmative showing that commitment was the least restrictive viable means of providing her with an education.

We reject respondents' argument for two reasons. First, in *Terrile*, prosecution was not under the Juvenile Court Act, and respondents have cited no case under the Act which requires application of the "least restrictive alternative" doctrine. In fact, cases dealing with the Act have said that any disposition available under section 5—2 (Ill. Rev. Stat. 1979, ch. 37, par. 705—2) may be used, with no single disposition being preferred over others. (*In re C.O.* (1979), 73 Ill. App. 3d 369, 391 N.E.2d 1075.) Furthermore, when proceedings are under the Juvenile Court Act, the State is concerned with protecting the best interests of the minor. This standard encompasses concern for the least restrictive viable placement for the minor.

Second, even if the "least restrictive alternative" doctrine were applicable to this case, the State has shown that placement in residential schools was the least restrictive *viable* alternative for placement of these minors. If the record makes one thing crystal clear, it is that the minors' mother has constantly frustrated and interrupted all efforts to keep the minors participating in an educational program. There is no reason to think that she would act differently in the future, and placement at home therefore was not a viable alternative.

■■ X. At the February 24 hearing, the court allowed into evidence a number of brochures describing the Woodhaven facility. Respondents argue that these brochures were not admissible under section 5—1(1) of the Act (Ill. Rev. Stat. 1979, ch. 37, par. 705—1(1)), which allows admission of "[a]ll evidence helpful in determining [the] question [of disposition], including oral and written reports * * *." They contend that the brochures should not be construed as written reports.

This provision, however, does not *limit* the evidence at dispositional hearings to oral and written reports. Rather, it allows the court to consider all *helpful* evidence. The witness who testified for the State about Woodhaven was unable to vouch for the accuracy of the statements made in the brochures. However, there is no doubt that the brochures could be helpful to the trial court. The lack of testimony supporting the accuracy of the brochures was merely a factor for the trial court to consider in determining the weight to be given to them.

XI. At the February 24 hearing, Alan Leach, a caseworker with DCFS, who had previously recommended that the minors be placed in their home, was called by respondents. The court refused to hear his testimony concerning Mrs. White's having begun to cooperate with DCFS by accepting homemaker services during the last two or three weeks. Respondents argue that Leach's proffered testimony should be regarded as an "oral report" under section 5—1(1) of the Act.

This testimony, however, was not relevant to the question before the court on February 24. At that time the court was no longer concerned with whether George should remain at home. That had been decided. The only issue at that hearing was which residential placement was appropriate. Thus, evidence supporting Leach's opinion that George should be placed at home was of no help in determining the question before the court. His testimony was properly excluded from evidence.

*Ergo*, no reversible error occurred at any stage of these proceedings.

In terminating this opinion, we observe that School District 87 made valiant efforts to structure educational programs, individually tailored for these three mentally handicapped boys. In fact, District 87 exceeded minimal good faith efforts by a long shot. Yet those attempts were continually thwarted, circumvented, baffled and, finally, defeated by the

mother of these lads. To our view, every step taken by District 87, Department of Mental Health, and the trial court in these cases totally adhered to the goal sought: the best interests of the minors involved.

Affirmed.

GREEN, P. J., and TRAPP, J., concur.