*In re* Y.C. *et al.* (The People of the State of Illinois, Petitioner-Appellee, v. Rhonda Cathey, Respondent-Appellant).

First District (6th Division)   No. 1—89—3067

Opinion filed November 26, 1990.

Randolph N. Stone, Public Defender, of Chicago (Robert D. Glick, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

This appeal stems from an order of the circuit court of Cook County which determined that the two subject minors were neglected, adjudicated them wards of the court, and placed them in the guardianship of the administrator of the Department of Children and Family Services (DCFS). Respondent, who is the children's mother, now ap-

peals from that judgment, contending that the court's determination was contrary to the manifest weight of the evidence.

The record shows that on April 13, 1989, petitions for the adjudication of wardship were filed alleging that the respondent's children, who were then 4 years and 1½ years of age, were neglected because their parents or those responsible for their welfare had not provided the care necessary for their well-being. (Ill. Rev. Stat. 1987, ch. 37, par. 802—3(1)(a).) A second count in the petition alleged that they were dependent in that they were without proper care due to the mental and/or physical disability of the parent, the respondent. Ill. Rev. Stat. 1987, ch. 37, par. 802—4(1)(b).

At the adjudicatory hearing held on September 13, 1989, Jeanette Cathey identified herself as the wife of respondent's maternal uncle who, together with her husband, had been appointed guardians of the now 20-year-old deaf respondent. At the time of this appointment, respondent was pregnant with R.C., and she and her daughter, Y.C., moved into the Cathey household. Since Jeanette and her husband were both employed (and had children of their own), respondent was responsible for the care of her own children while she was living with them.

Jeanette further testified that respondent was a good mother when she had her head "on straight," but recalled instances when respondent would become angry, leave the household without her children and stay out all night without making arrangements for the care of the children, who were then left with Jeanette and her family. In one instance respondent asked Jeanette's daughter to care for the children while she went to the store; however, she did not return until the next day. When respondent returned, she told the Catheys that she had been raped, and an investigation by law enforcement personnel and an examination by hospital personnel were made. Later, however, respondent admitted that she had lied and apologized to them for the situation she had caused.

Jeanette also recalled an incident which occurred in the spring of 1988 when respondent had asked permission to go away for the weekend with her children and a girlfriend, but she did not return as promised. Jeanette eventually received a call at work asking her to come to the police station, and when she and her husband arrived there, she saw respondent, standing on the steps soaking wet from being out in the rain, and R.C., with no bottle or diapers. Respondent told them that her boyfriend, with whom she had spent the weekend, had taken her belongings.

Jeanette also testified that while she was living with them, re-

spondent was seeing a therapist at Michael Reese Hospital in order to prepare her for independent living. On the day in January 1989, which was supposed to be her final visit with the therapist, respondent's boyfriend and R.C. accompanied her to the hospital. Later that evening, however, Jeanette and her husband were called to pick up R.C. when respondent was hospitalized. Jeanette was unable to speak with respondent at this time, but respondent's boyfriend told her that he was also being admitted after he admitted that they intended to commit suicide. Jeanette stated that she and her husband were unable to care for the children without respondent in the household, and she contacted her husband's sister, Denise, who then took over the care of the respondent's children.

Denise Cathey testified that she is respondent's maternal aunt and took over the care of respondent's children after being apprised of the situation by her brother. She then contacted DCFS, but for a period of months cared for the children with her own resources. She also brought them to visit respondent during this period. She stated that respondent never visited them at her home and reported that respondent even refused to come to the birthday party which she had scheduled for Y.C. Denise surmised that respondent's refusal had to do with Denise's rule concerning respondent's boyfriend, who was not welcome at her home. Denise also informed the court that respondent resided at the Bridge for a period of time, which was then identified as an adult, independent living program for the deaf.

In her further testimony, Denise acknowledged that she had filed a false report with DCFS alleging that the children had been left in an abandoned building because she had no response from DCFS and had been unable to procure monetary assistance for their care. This report finally elicited a response from DCFS, and she admitted the falsity of her statement to them immediately. She subsequently began receiving money for the care of the minors. After Denise received the first check from DCFS, respondent was released from the Bridge and gave Denise the money from her public aid check for their care.

Wanda Wilson testified that she is a DCFS child welfare specialist who was assigned to the cases of the minors at bar. In that capacity she visited respondent at the hospital where respondent told her that she had been kept because of her suicide pact with her boyfriend. Wilson also reported that she was currently attempting to arrange a proper placement for respondent, and that during her observations of respondent's visits with her children, she found respondent's behavior to be appropriate. Respondent also told her that she had an agreement with her aunt to care for the children.

After the state rested, respondent testified on her own behalf. She stated that when she was hospitalized in January, Jeanette and her husband picked R.C. up at the hospital and brought the children to Denise, who cared for them while she was a patient. When she was released from the Bridge, she gave Denise her entire check of $187 for the care of the children.

At the close of argument, the court found that the evidence showed that respondent was hospitalized for psychiatric reasons in January 1989, and that in the absence of a care plan for her children, her relatives took over their care. The evidence further showed that in the next five months, respondent did not provide any financial support for the minors and that her aunt made a false report to DCFS in order to obtain some financial help. The court concluded on the evidence presented that the State had proved the allegation of care necessary as to both children by a preponderance of the evidence.

At the dispositional hearing which followed, reports were presented to the court concerning the efforts made to enroll respondent in parenting classes and to obtain housing for her and her children. The court was also apprised that respondent had recently been hospitalized for about three weeks and that the children were doing well in their placement with their aunt. The DCFS social worker then recommended to the court that the administrator of DCFS be appointed guardian of the children with the right to place them with the aunt until respondent found suitable housing. At that point the court entered a finding of "inability" as to the respondent, a finding of "unwilling" as to the father, and a determination that the best interests of the children would be served by the appointment of the guardian as indicated. The court also scheduled a progress report on respondent's pursuit of suitable housing.

In this appeal respondent contends that the trial court's neglect determination was against the manifest weight of the evidence. Respondent maintains that the trial court's focus was improper in that it centered on the neglect of the parents, rather than on the actual condition of the children, and since there was no showing in this case that the children had been neglected, the court's decision should be reversed.

■■ Under the current codification of the Juvenile Act (Act), a neglected minor includes "any minor under 18 years of age whose parents or other person responsible for the minor's welfare does not provide the proper or necessary support *** or other care necessary for his or her well being." (Ill. Rev. Stat. 1987, ch. 37, par. 802—3(1)(a).) The petitions for the adjudication of wardship in this case al-

leged that the children were neglected in this respect and named their mother as respondent. The State had the burden of proving these allegations by a preponderance of the evidence (*In re Aaronson* (1978), 65 Ill. App. 3d 729, 382 N.E.2d 853), and the determination as to whether the State had met its burden fell upon the trial court, which was in a superior position to observe the demeanor and conduct of the parties and the witnesses. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.) On appeal, the trial court's determination will not be disturbed unless it is against the manifest weight of the evidence. *In re Stilley*, 66 Ill. 2d 515, 363 N.E.2d 820.

In the case at bar, the court found neglect in the evidence which showed that respondent had been hospitalized in January 1989 after revealing a suicide pact with her boyfriend. Her relatives were called to the hospital to pick up R.C., and others assumed the responsibility for the children's care. The court found that there was no initial plan provided for the children and that from January through May, respondent failed to provide any financial support for them. This, in turn, led respondent's aunt to make a false report to DCFS in order to get their attention and some financial aid. On this evidence the court found the neglect allegation was proven by a preponderance of the evidence and subsequently adjudicated the children wards of the court. Although defendant takes issue with that finding because there was no showing that the children were actually neglected, we find, for the reasons which follow, that the court's focus on the parent was proper and its decision supported by the record.

In the recent case of *In re B.T.* (1990), 204 Ill. App. 3d 277, a similar argument was raised and rejected. In that neglect case, respondent pointed out that no physical harm had befallen her minor children; however, the appellate court determined that the present codification of the statute focuses on parental neglect in providing the necessary care for the minors' well-being, and held that respondent's good fortune did not negate the evidence of her dereliction of duty with regard to her children. In reaching that conclusion the court found that the reasoning set forth in *In re Stilley* and *In re Ritchie* (1978), 58 Ill. App. 3d 1045, 374 N.E.2d 1292, had been incorporated into the current statute, then distinguished *In re Gates* (1978), 57 Ill. App. 3d 844, 373 N.E.2d 568, which is also cited by respondent in this case, in that it predated the current statute and does not comport with its plain language. (*In re B.T.*, 204 Ill. App. 3d at 281.) We find this decision dispositive of the argument raised by respondent in this case. Here, as in the case of *In re B.T.*, the evidence showed that respondent had failed to provide the care necessary for her children's

well-being, and, accordingly, that they were neglected within the plain meaning of the statute.

In reaching this conclusion, we bear in mind that "neglect" is generally considered to be the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty. (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769.) The term is not one of fixed and measured meaning, but rather takes its content from the specific circumstances of each case (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820; *In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872). In this case, we find that the court properly focused on the parent in determining whether neglect had been established and that its decision was consistent with and supported by the manifest weight of the evidence.

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and EGAN, JJ., concur.